JANIK PAVING & CONSTRUCTION, INC., et al., Plaintiffs-Appellants,

v.

William E. BROCK, III, as Secretary of the United States Department of Labor, et al., Defendants-Appellees.

No. 1322.

Docket 87–6113.

United States Court of Appeals, Second Circuit.

Argued May 26, 1987.

Decided Sept. 9, 1987.

Thomas E. Brydges, Buffalo, N.Y. (Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., Wayne R. Gradl, of counsel), for plaintiffs-appellants.

Donald P. Simet, Asst. U.S. Atty., Buffalo, N.Y. (Roger P. Williams, U.S. Atty. for the W.D.N.Y., Buffalo, N.Y., Linda Jan S. Pack, Counsel for Appellate Litigation, Leif Jorgenson, Attorney, U.S. Dept. of Labor, Washington, D.C., of counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, and LUMBARD and MINER, Circuit Judges.

LUMBARD, Circuit Judge:

On this appeal, we are primarily asked to decide whether the Secretary of Labor has the statutory authority to "debar" a contractor which has violated overtime hours and pay provisions of the Contract Work Hours and Safety Standards Act ("CWHSSA"), 40 U.S.C. §§ 327–333, from working on any contract or subcontract receiving federal funding under numerous specified statutes, for a period of up to three years. Appellants, Janik Paving and Construction, Inc. and William J. Janik, its president, appeal from an order of the district court for the Western District (Elfvin, J.), which dismissed their action. They challenge the Secretary's authority to debar them from such work, as well as the sufficiency of the evidence which the Department of Labor amassed in support of the debarment order. We affirm.

Janik Paving has been primarily engaged in the highway paving and construction business since 1979. Most of its business, according to appellants, involves work on highway paving and construction projects which receive federal funding. This appeal arises from Janik's performance on two such contracts.

In 1980, Janik was awarded the prime contract by the Town of West Seneca, New York for the construction of certain sidewalks, curbs, and drains ("the Edson Street contract"); the work was to be financed under the Housing and Community Development Act of 1974. That same year, Janik was also awarded the prime contract by the New York State Department of Transportation for the installation of concrete and asphalt pavement in Holland, New York ("the Route 16 contract"), with financing to be provided under the Federal-Aid Highway Act of 1956.

Both of these federal financing statutes contained "Davis-Bacon" provisions, which obligated Janik, as contractor, to pay the laborers and mechanics it employed on these contracts the wages prevailing for similar construction in the same localities. *See* Davis-Bacon Act, 40 U.S.C. §§ 276a–276a–5 (1931); Federal-Aid Highway Act of 1956, as amended, 23 U.S.C. § 113(a); Housing and Community Development Act of 1974, 42 U.S.C. §§ 5310, 1440(g). Because both contracts involved federal assistance under statutes prescribing wage standards, Janik also was required to comply with the provisions of CWHSSA, which, in pertinent part, required contractors on federally-funded construction projects to pay their laborers and mechanics "time and one-half" for hours worked in excess of eight hours in one day or forty hours in one week. 40 U.S.C. §§ 328, 329.[1]

Under the statute then and now, a contractor found in violation of overtime pay and hour requirements may be held liable to its affected employees for failure to pay the required amounts and to the government for liquidated damages in the sum of $10 for each calendar day on which these employees were underpaid. 40 U.S.C. § 328. A contracting governmental agency may withhold and pay directly to the affected workers any amounts in contract monies necessary to satisfy the contractor's overtime obligations. *Id.* at § 330(a). Criminal penalties may also be assessed. 40 U.S.C. § 332.

Enforcement of the CWHSSA is also subject to a regulatory regime which applies to sixty statutes prescribing labor standards for federal or federally-assisted contracts. *See* 29 C.F.R. § 5.1 (1983) (listing the statutes, collectively referred to as "Davis-Bacon Related Acts"). As pertains here, the regulations provide that,

> Whenever any contractor or subcontractor is found by the Secretary of Labor to be in aggravated or willful violation of [overtime hours and pay requirements of the CWHSSA or] the labor standards of any of the [other Davis-Bacon Related Acts], such contractor or subcontractor or any firm, corporation, partnership, or association in which such contractor or

---

1. The CWHSSA has since been amended to require contractors to pay overtime rates only for hours worked in excess of a forty-hour work week. 99 Stat. 583, 734 (1985).

subcontractor has a substantial interest shall be ineligible for a period not to exceed 3 years ... to receive any contracts or subcontracts subject to any of the statutes listed in § 5.1.

29 C.F.R. § 5.12(a)(1) (the "debarment regulations").

Between February and June, 1981, the Department of Labor, through the Wage and Hour Division of its Employment Standards Administration, investigated Janik's performance of the Edson Street and Route 16 contracts. A Division investigator, Patrick Rafter, inspected payroll records and employee time cards which Janik kept for the two contracts. Rafter also interviewed, directly or through questionnaires, approximately 35 past and present Janik employees, 12 or 13 of whom complained about the insufficient overtime wages they had received on the Route 16 and Edson jobs. Based on Rafter's findings, the Division concluded that certain of Janik's employees had not been paid at overtime rates for all such hours worked and that certain of Janik's payroll records had been falsified.[2] On May 9, 1983, the Wage and Hour Division notified Janik Paving and William Janik of its finding and advised them that they would be debarred from future federally-sponsored work. On May 25, 1983, appellants challenged these findings and requested an administrative hearing. *See* 29 C.F.R. §§ 5.11(b), 5.12(b).

More than two years later, on June 12 and 13, 1985, an evidentiary hearing was held before Administrative Law Judge ("ALJ") Edward J. Murty, Jr. The Division's case consisted of the testimony of six of Janik's former employees who had worked on the Edson Street project during the period in question, 1980, as well as the testimony of Rafter, the Division's investigator.[3]

The former employees testified that they had consistently noticed that the hours which they recorded on the employee timecards submitted to the company were greater than those reflected on their pay stubs. All were aided in testifying by contemporaneous personal records which they kept of the hours they reported. Only two of the employees produced their records for the hearing, however, and only the records of one, Timothy Hart, were received in evidence.[4]

Four of the employees further testified that they had consistently logged their hours on Janik's employee timecards in one-half hour increments. Janik's certified payroll records, however, showed that payments for overtime hours were made to the nearest quarter-hour. Finally, one of the former employees, Richard Pollard, testified that he visited Janik's offices at one point to ask about his hours and discovered that the timecards Janik had maintained on him were not the same as those he had submitted and that the hours on Janik's timecards were different from those he had reported. Pollard stated that William Janik then telephoned him and indicated that he would discharge him if he turned Janik in to the Department of Labor. John Wilczak, another employee-witness, testified that he, too, had been approached by Janik's president while working on the Route 16 contract, and that William Janik asked him to work 60 hours per week at straight time.

**2.** The Division found that Janik had failed to pay $1,123.72 in overtime compensation to nine employees who worked on the Edson contract as power equipment operators, truck drivers or laborers and $13,670.74 to 21 of Janik's employees performing similar work on the Route 16 contract. As the result of the investigation, the Division also determined that Janik falsified its payroll records by reducing reported hours "by one-third in an effort to simulate that ... employees were paid proper overtime compensation."

**3.** The Wage and Hour Division's allegations with respect to the Route 16 contract were set-

tled prior to the hearing. Janik agreed to pay the affected workers $13,000 in back overtime pay. The Division agreed that Janik's settlement of these charges would not constitute evidence or admission of wrongdoing. Evidence pertaining to Janik's performance on the Route 16 contract was nonetheless received, as it pertained to the debarment issue.

**4.** ALJ Murty rejected the proffered records of the other employee-witness after it was developed on cross-examination that the materials produced had in fact been copied at some unknown point from the actual records supposedly kept contemporaneously.

Rafter testified he had concluded, from interviews with Janik's employees, that in 1980 Janik had a practice "of falsifying its payroll and reducing the hours and overtime situations so that when overtime was paid on reduced hours, straight time pay would result." He explained that many of the 20 to 22 workers who indicated no problems with their overtime pay had not worked for Janik during the period in question or had worked in capacities not subjecting their wages to the CWHSSA. He further testified the difference in time increments used by Janik and its employees in recording hours worked indicated improper recordkeeping. In his experience, Rafter stated, the use of quarter-hour increments could indicate that reported overtime hours were being manipulated to achieve straight time pay rates.

Janik presented three rebuttal witnesses. William Janik denied that his company had a policy of reducing overtime hours but avoided categorically denying that Janik had not reduced overtime hours. He further denied having ever asked employee Wilczak to work overtime at straight time rates or threatened Pollard with discharge if he reported Janik to the government. James Nowak, a foreman on the Edson Street contract, and Raymond Schaeffer, a superintendent on the Route 16 job, testified that they had never been shortchanged on their overtime pay. Nor were they aware of any systematic practice on Janik's part to reduce overtime hours to avoid paying overtime rates. Schaeffer testified that while he would occasionally reduce the overtime hours reported to him by workers, he did so because it was clear that the hours had not been worked. He further explained that hours were recorded in quarter-hour increments on the Route 16 project to reflect better the 15 minute commutation time to the worksite.

By decision dated May 1, 1986, ALJ Murty found that the evidence conclusively established that Janik had "willfully paid employees straight time for overtime hours worked and willfully falsified their certified payrolls to conceal this practice," agreeing with the Division's charge that Janik had manipulated overtime pay rates by reducing overtime hours by one-third. The ALJ credited the testimony of the Division's six employee witnesses. He compared Timothy Hart's personal records with his pay stubs and found a pattern of reduction of overtime hours which corroborated the others' testimony. The ALJ found that Janik's witnesses "unconvincingly answered" the questions raised.

ALJ Murty ordered Janik to pay a total of $1,123.72 in back wages to nine specified employees. Finding Janik's violations to be willful, he also ordered that the company and its president be debarred. Since there was no evidence that Janik or William Janik had previously violated wage and hour laws, and since Janik had cooperated in settling the Route 16 charges, however, ALJ Murty prescribed a two year debarment period, instead of the maximum three years permitted by regulation.

Following unsuccessful appeals to the Department of Labor's Wage Appeals Board, appellants, on February 5, 1987, commenced this action to enjoin preliminarily the Secretary of Labor, other Department of Labor officials, and the Comptroller General from implementing the debarment order and to annul the debarment on the grounds that it was unsupported by substantial evidence. Judge Elfvin merged the motion for preliminary injunction with an expedited consideration of the merits of appellants' action. Appellees, in turn, withheld appellants' names from the Comptroller General's list of ineligible contractors pending the district court's determination.

On April 16, 1987, Judge Elfvin dismissed the action. He concluded that ALJ Murty "could rationally have found" that work was being performed by Janik employees for which insufficient compensation had been made and that the government had produced sufficient evidence to show the extent and amount of the undercompensated work. Finding that "the power of debarment was inherent and necessarily incidental to the effective administration of the statutory scheme," Judge Elfvin upheld the validity of the Secretary of La-

bor's debarment regulation. This appeal followed.[5]

In assessing appellants' challenge to the Secretary of Labor's authority to debar violators of the CWHSSA's overtime provisions, we begin with the language of the statute. While expressly setting forth certain civil and criminal consequences attending a violation of overtime pay requirements, described above, the statute nowhere mentions debarment. The CWHSSA does, however, contain two provisions delegating rulemaking authority to the Secretary, only one of which is germane.[6]

> Section 330(d) of the CWHSSA states: Reorganization Plan Numbered 14 of 1950 ... shall be applicable with respect to the provisions of this subchapter, and section 276c of this title, shall be applicable with respect to those contracts and subcontractors referred to therein who are engaged in the performance of contracts subject to the provisions of this subchapter.

Section 276c, adopted as part of the Copeland Anti-Kickback Act, 18 U.S.C. § 876 empowers the Secretary to "make reasonable regulations for contractors and subcontractors" engaged in federally-financed public work projects, 40 U.S.C. § 276c (1964). Reorganization Plan No. 14 of 1950, 5 U.S.C. Appendix IX, p. 242, in pertinent part states:

> In order to assure coordination of administration and consistency of enforcement of the labor standards of each of the following Acts by the Federal agencies responsible for the administration thereof, the Secretary of Labor shall prescribe appropriate standards, regulations, and procedures, which shall be observed by these agencies, and cause to be made by the Department of Labor such investiga-

tions, with respect to compliance with and enforcement of such labor standards, as he deems desirable ...

One of the statutes which the plan initially covered was the Eight Hours Laws, 37 Stat. 137 (1912), as amended, 40 U.S.C. §§ 324–26 (1958), the CWHSSA's predecessor. Like the CWHSSA, this act specifically provided civil and criminal sanctions for violations of overtime work requirements but failed to mention debarment.

The legislative history of the CWHSSA is also silent about the prospect of debarment. The statute's broad objective, according to Senate Report No. 1722, was to "bring order to the confusion which ... mark[ed] the application and enforcement" of work standards legislation resulting from federal contracting under the Eight Hours Laws. S.Rep. No. 1722, 87th Cong., 2d Sess., *reprinted in* 1962 U.S.Code Cong. & Ad.News 2121. The Report observed that under the provisions then in force many contractors were either subject to criminal sanction or liquidated damages, but not both; the CWHSSA would "consolidate the existing laws into a single statute with simplified provisions which apply in the same way to all contractors and subcontractors ... coming within its terms." *Id.* at 2121–22.

■ Based on the failure of the statute and legislative history to refer to debarment, appellants conclude that Congress did not mean to allow the Secretary of Labor such power. They argue that debarment constitutes a penalty, which, under well-established law, can be authorized only by specific statutory language. We disagree.

The debarment regulation at issue has been in effect since 1951 and has been

---

**5.** On April 21, 1987, simultaneously with filing a notice of appeal, appellants unsuccessfully moved the district court for an order staying publication of their names in the Comptroller General's list of ineligible contractors pending appeal. On April 28, 1987 a panel of this Court granted appellants' motion for a stay, pending appeal and ordered the appeal expedited.

**6.** The statute's other rulemaking provision, 40 U.S.C. § 331 states:

> The Secretary may provide such reasonable limitations and may make such rules and regulations allowing reasonable variations, tolerances, and exemptions to and from any or all provisions of this subchapter as he may find necessary and proper in the public interest to prevent injustice or undue hardship or to avoid serious impairment of the conduct of Government business.

relied upon since then by the Secretary in enforcing, not only the provisions of the CWHSSA, but also scores of other Davis-Bacon related acts which do not include their own enforcement mechanisms. While "the mere fact that the [regulation] is of long standing does not relieve us of our responsibility to determine its validity, *see SEC v. Sloan*, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), it is noteworthy that no court has ever held that the [regulation] is invalid." *Touche, Ross & Co. v. S.E.C.*, 609 F.2d 570, 578 (2d Cir.1979). Indeed, prior to the appellants' challenge to the validity of the Secretary's debarment regulation, the only such reported challenge was in *Copper Plumbing & Heating Co. v. Campbell*, 290 F.2d 368 (D.C.Cir.1961), where it was rejected.

In *Copper Plumbing*, the court had before it a challenge to the Secretary of Labor's debarment authority under the Eight Hours Laws. Relying on the Supreme Court's reasoning in *Steuart & Bro. v. Bowles*, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350 (1944), the Court first determined that debarment was not a penal sanction. In *Steuart & Bro.*, the Supreme Court upheld the Price Administrator's power to suspend distributors found to have violated wartime rationing regulations from further access to rationed supplies, under an enabling statute affording the President the power to allocate and ration scarce materials. The statute provided criminal and civil penalties for violations of the rationing regulations but said nothing of suspension.

Writing for the Court, Justice Douglas observed that the President's power to allocate scarce supplies "would be a feeble power indeed" were it construed not to embrace the power to suspend those who have contravened the rationing scheme. Concluding that the power to suspend was necessarily subsumed in the power to allocate, the Court rejected the argument that suspension orders constituted penal sanctions.

We agree that it is for Congress to prescribe the penalties for the laws which it writes. It would transcend both the judicial and the administrative function to make additions to those which Congress has placed behind the statute.... Hence we would have no difficulty in agreeing with petitioner's contention if the issue were whether a suspension order could be used as a means of punishment of an offender. But that statement of the question is a distortion of the issue presented on this record.

322 U.S. at 404, 64 S.Ct. at 1100. It was a distortion, the Court held, because the suspension was clearly related to and in the aid of the efficient distribution of scarce wartime materials, the purpose of the statute.

Applying *Steuart & Bro.*, the D.C. Circuit framed the test as follows: "[W]hether temporary debarment is relevant to the maintenance of responsible bidding under and compliance with the labor acts." *Copper Plumbing, supra*, 290 F.2d at 372. The Court concluded that it was, and so was not a penalty, even though debarment was "a serious blow," especially to firms specializing in government business.

Reasoning that Reorganization Plan No. 14 conferred upon the Secretary of Labor the powers theretofore residing in the federal contracting agencies separately, the D.C. Circuit then concluded that the Secretary had the authority to debar because the contracting agency itself (there the Department of the Army) could have included a debarment provision in its regulations. Although debarment had not in fact been embraced by an explicit regulation of the agency, the court found that the agency's power "to enter into contracts in accordance with relevant statutes," which "included the authority by regulation to prescribe appropriate standards for securing compliance with the labor provisions," included the authority to debar. *Id.* at 373. Debarment, the Court further observed, was a reasonable measure which the Secretary could embrace as part of his coordinated and consistent enforcement of federal labor standards under Reorganization Plan No. 14, because it was one specifically endorsed by "kindred statutes," including the Davis-Bacon Act, which was covered under the Plan.

We agree with the reasoning of *Copper Plumbing* and believe that it applies with equal force to the Secretary's authority under the current statute, the CWHSSA.

The effective enforcement of a statute often requires the use of coercive means. That a measure, such as debarment, may incidentally punish while it deters a statutory violation does not transform it into a purely punitive sanction. Consequently, we are not persuaded by the appellants' contention that debarment is a penalty and therefore is available as a sanction only when the statute specifically authorizes it.

We understand *Steuart & Bro.* to teach that if the sanction serves to compel compliance with the statute's substantive goals, then it should not be deemed a "penalty". That test is clearly satisfied here. Debarment of contractors found in willful violation of overtime requirements is as essential to the enforcement of labor standards in federal contracting as suspension was to wartime rationing; both serve to protect the integrity of their respective statutory schemes. Indeed, debarment may be the only realistic means of deterring contractors from engaging in willful overtime pay violations based on a cold weighing of the costs and benefits of non-compliance.

Moreover, the debarment prescribed by regulation is subject to modification. After six months, a debarred contractor may petition the Department of Labor to be removed from the Comptroller General's list of ineligible contractors. In deciding whether to remove the debarred contractor, the Department considers whether there has been a showing of "current responsibility to comply with the [the relevant] labor standards provisions." 29 C.F.R. § 5.12(c). These aspects of the debarment regulation make clear that it was promulgated primarily to enforce the statute, not to administer punishment.

In numerous other instances, the Supreme Court and the courts of appeals have recognized the concept of implied powers of administrative enforcement even though the means of enforcement were not expressly stated in the enabling statute.

*See, e.g., Gemsco, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945) (Secretary of Labor's regulation barring industrial homework as necessary to preserve the wage floor contemplated by the Fair Labor Standards Act); *West v. Bergland,* 611 F.2d 710 (8th Cir.1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980) (Secretary of Agriculture's authority to certify grades of agricultural products, together with authority to promulgate regulations in the administration thereof, provides implied authority to suspend grading services to those who improperly interfere with officials' performance of such services); *Jacquet v. Westerfield,* 569 F.2d 1339 (5th Cir.1978) (Secretary of Agriculture's authority to administer the Food Stamp program embraced power to disqualify from future participation recipients found to have defrauded the program). *Cf. Touche, Ross & Co. v. S.E.C.,* 609 F.2d 570 (2d Cir.1979) (Commissioner has authority to disqualify professionals found to be lacking in qualifications or to have engaged in unethical or improper conduct from appearing before the agency).

■ Nor is our analysis inconsistent with constraints on administrative rulemaking subsequently recognized by the Supreme Court. To be sure, an agency may not, in the guise of interpreting its enabling legislation, make new law or fill gaps in its regulatory authority to meet its perceived needs. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976); *Federal Maritime Comm. v. Seatrain Lines,* 411 U.S. 726, 745, 93 S.Ct. 1773, 1784, 36 L.Ed.2d 620 (1973). However, the cases upon which appellants rely make clear that a regulation will be declared invalid only where it is inconsistent with the language or structure of the statute or its legislative history. *See United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982); *American Textile Mfrs. Inst. v. Donovan,* 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981); *Ernst & Ernst, supra; Federal Maritime Comm., supra.*

Here, far from negating the Secretary's authority to debar contractors, the struc-

ture and legislative history of the CWHSSA put it on firmer ground. Unlike its predecessor, the CWHSSA specifically incorporated two rulemaking provisions offering the Secretary the regulatory means to effect compliance with the statute. The Secretary has relied on both in promulgating the set of regulations in which the debarment regulation appears. 29 C.F.R. § 5.1. The first, section 276c of title 40, as mentioned above, empowers the Secretary to "make reasonable regulations for contractors and subcontractors." We construe this open-ended provision to include "such rules and regulations as may be necessary to carry out the provisions" of the CWHSSA. *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 246 (2d Cir.1977). As such, the regulations promulgated under this provision must be "sustained so long as [they are] 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973) (quoting *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969)).

■ The other provision, significantly, is Reorganization Plan No. 14, upon which, since 1951, the Secretary has consistently relied as a statutory basis for the debarment regulation. In contemplating the CWHSSA in 1962, Congress could hardly have been ignorant of the Secretary's debarment practice under this Plan or its judicial endorsement in *Copper Plumbing*, decided a year before. Accordingly, under well-established law, we must presume that in incorporating this rulemaking provision verbatim, Congress embraced the prevailing administrative and judicial construction of it. *See, e.g., Lorillard v. Pons*, 434 U.S. 575, 585, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *St. Regis Mohawk Tribe, New York v. Brock*, 769 F.2d 37, 49–50 (2d Cir.1985) (applying the presumption to find that Secretary of Labor had authority under the 1973 version of CETA to order repayment of misused funds based on Department's practice under a provision first adopted under a predecessor statute), *cert. denied,*

—— U.S. ——, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986).

Nor do we believe that Congress's silence must be construed otherwise because it expressly granted debarment authority in subsequently enacting the Service Contract Act of 1965, 41 U.S.C. §§ 351–358, 354(a), which extended wage and hour standards to government service providors, and the 1969 Health and Safety Standards Act, 40 U.S.C. § 333, which added provisions prescribing workplace standards to the CWHSSA. "That a later Congress seeks to grant expressly a power which an earlier Congress has granted by implication does not negate the existence of the power prior to the express grant." *Jacquet v. Westerfield, supra*, 569 F.2d at 1345 (citing *United States v. Southwestern Cable Co.*, 392 U.S. 157, 169–71, 88 S.Ct. 1994, 2000–02, 20 L.Ed.2d 1001 (1968)).

Appellants focus on the debarment provision in the Health and Safety Standards amendment to the statute. Section 333(d), they observe, calls for debarment only after there has been a "repeated willful or grossly negligent violation" of health and safety regulations and only after the Secretary has demonstrated that other enforcement devices have proven ineffective; in contrast, debarment for violations of overtime requirements, under the challenged regulation, is triggered only if the violation is "willful" and there is no requirement that other enforcement remedies be exhausted. Moreover, as appellants observe, in providing for debarment for health and safety violations, Congress was careful to provide, as the legislative history particularly notes, "complete judicial safeguards" against its abuse, in the form of direct review in the courts of appeals. S.Rep. No. 320, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad.News 1071, 1075. As a consequence, they assert that Congress could not possibly have intended the "anomaly" whereby contractors accused of violating a statute containing no express debarment provision could more likely be debarred than those accused of violating a statute where debarment is an express remedy.

Appellants' arguments do not persuade us, however, that a 36 year-old practice which Congress has repeatedly condoned and which we view as integral to the Secretary's effective enforcement of labor standards provisions must nonetheless be deemed invalid.

■ Appellants further contend that the district court erred in applying an "arbitrary and capricious" rather than the "substantial evidence" standard to review the Secretary's debarment order. They alternatively argue that the order is not supported by substantial evidence. As it is clear to us that there was substantial evidence justifying appellants' debarment, we find it unnecessary to discuss the appropriate scope of judicial review.

"Substantial evidence", according to well-worn definition, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See, e.g., Local One, Amalgamated Lithographers v. N.L.R.B.*, 729 F.2d 172, 175 (2d Cir.1984) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

Here, the employee testimony—together with the personal time records of one of them, Timothy Hart, and the expert opinion of investigator Rafter—adequately supported ALJ Murty's conclusion that the Department of Labor had presented a *prima facie* case that not all of Janik's employees had been properly paid for overtime hours on the contracts in question.

All of the employee-witnesses testified that the overtime hours for which they were paid were consistently lower than those they actually reported. They came to this conclusion, their testimony makes clear, not as the result of an amorphous feeling, but based on contemporaneous records. ALJ Murty expressly found their testimony credible. We see no reason to differ with the ALJ's credibility determinations. The ALJ's credibility determinations were not so "hopelessly incredible" or "flatly contradicted" either by the "law of nature" or "undisputed documentary testimony" as to require being overturned. *N.L.R.B. v. American Geri-Care, Inc.*, 697 F.2d 56, 60 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983).

It is not unusual, given the five year hiatus between appellants' alleged wage violations and the administrative hearing, that the employees' testimony lacked sharpness concerning the specific circumstances under which they worked undercompensated overtime hours or that some of the employees had made prior inconsistent statements concerning whether, or when, they had complained to the company about their pay. Nor, for similar reasons, is it surprising to find that many of the employees could no longer find or produce the original wage and hour records they kept of five year old jobs. Indeed, the Supreme Court, in articulating the burden of proof to which the Department and employees were generally subject in wage-standard violations noted that "[e]mployees seldom keep records themselves" and "even [when] they do, the records may be and frequently are untrustworthy." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946).

We do not agree with the appellants' contention that the ALJ's conclusion rested on uncorroborated, albeit consistent, past recollection. We believe that he appropriately compared Timothy Hart's personal records with his pay stubs, which Janik provided, and found that the comparison accorded with the former employees' memories. Furthermore, ALJ Murty had the benefit of the expert opinions of an experienced wage and hour compliance officer, Patrick Rafter. Rafter's testimony provided a plausible explanation for the consistent appearance of quarter-hour increments in Janik's recording of overtime hours, but not in its recording of straight time. As Rafter explained, reducing overtime hours by one-third would have caused many of the overtime hours to end in fractions of one-thirds; this would have made the scheme "obvious". Rounding the reduced hours to the quarter-hour would conceal the practice.

Appellants argue, however, that the Department failed to meet its *prima facie* burden under *Mt. Clemens* because it failed to produce "sufficient evidence to show the amount and extent" of the undercompensated work, 328 U.S. at 687, 66 S.Ct. at 1192, and because it failed to contradict the company's payroll records showing proper overtime compensation. We disagree.

In *Mt. Clemens*, the amount allegedly underpaid was central to the dispute, whereas in this case it is incidental. The primary point in controversy here is appellants' willful practice of underpayment (*i.e.* whether appellants engaged in the practice of systematically reducing overtime hours to avoid paying the proper overtime rates). Consequently, we do not believe that the Department's *prima facie* case for debarment is weakened because the testimony of the six former employees or the other evidence it offered may have been too vague to demonstrate with some precision the amount and extent of undercompensated overtime work for each affected employee.

Moreover, contrary to appellants' suggestion, the Department's evidence called the accuracy of Janik's payroll records into question. Four of the employee witnesses, whom ALJ Murty found believable, testified that they had reported their hours in half-hour increments only. Yet Janik's certified records, as ALJ Murty observed, were replete with quarter-hour entries where employees' overtime hours were concerned but, curiously enough, contained no such entries for employees' regular time.

ALJ Murty also could have reasonably concluded that Janik failed to rebut the inference of underpayment for overtime work. Its three witnesses provided only generalized denials of wrongdoing, which ALJ Murty found "unconvincing." Significantly, no Janik employee in a non-supervisory capacity testified on the company's behalf. One of its witnesses, supervisor Schaeffer, admitted that he had occasionally reduced the overtime hours reported by the workers on the Route 16 job, but the handful of instances he could recall did not even begin to explain the magnitude of the discrepancies in hours to which the employee-witnesses attested. Similarly, none of Janik's witnesses provided an explanation for using quarter-hour increments which would have accounted for the frequency of their appearance on Janik's certified payrolls and only in the recording of overtime hours.

In sum, we find no basis for disturbing ALJ Murty's decision to credit the testimony of the Department's witnesses. The former employees' testimony, which is corroborated by personal time records, sufficiently demonstrated the fact of underpayment for overtime hours. Janik's unjustified use of quarter-hour increments in recording overtime sufficed to give rise to a presumption of concealment, adequate, under the Department's regulations, to show a willful violation of overtime requirements necessary for debarment.

Affirmed.