**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1922
_____

UNITED STATES OF AMERICA EX REL.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS LOCAL UNION NO. 98

v.

THE FARFIELD COMPANY,
                                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-09-cv-04230)
District Judge:  The Honorable Mark A. Kearney
_____

Argued March 10, 2021

Before: SMITH, *Chief Judge*, McKEE and AMBRO, *Circuit Judges*

(Filed July 13, 2021)

Susan R. Friedman [ARGUED]
STEVENS & LEE
51 South Duke Street
P.O. Box 1594
Lancaster, PA 17602

Thomas I. Vanaskie
STEVENS & LEE
1500 Market Street
Centre Square
East Tower, Suite 1800
Philadelphia, PA 19102
    *Counsel for Appellant*

Marc L. Gelman [ARGUED]
Richard B. Sigmond
JENNINGS SIGMOND
1835 Market Street, Suite 2800
Philadelphia, PA 19103

James E. Goodley, I
1650 Market Street, Suite 3600
Philadelphia, PA 19103

Ryan P. McCarthy
GOODLEY MCCARTHY
1650 Market Street
One Liberty Place, Suite 3600
Philadelphia, PA 19103
    *Counsel for Appellee*

Catherine Ruckelshaus
NATIONAL EMPLOYMENT LAW PROJECT
90 Broad Street, Suite 1100
New York, NY 10004
>*Counsel for Amicus Appellees Community*
>*Justice Project, Community Legal Services, and*
>*National Employment Law Project*

Shauna B. Itri
SEEGER WEISS
1515 Market Street, Suite 1380
Philadelphia, PA 19102
>*Counsel for Amicus Appellee Taxpayers against*
>*Fraud Education Fund*

Esmeralda Aguilar
SHERMAN DUNN
900 7th Street, N.W., Suite 1000
Washington, DC 20001
>*Counsel for Amicus Appellee North America*
>*Building Trades Unions*

## Table of Contents

**I. Legal Background** ........................................................2

    A. The Davis-Bacon Act.................................................2

    B. The False Claims Act...............................................4

**II. Factual Background** ....................................................6

**III. Procedural Background**............................................11

**IV. Jurisdiction & Standard of Review** ...........................15

**V. Discussion** ................................................................16

    A. Section 3729(a)(1)(B) Applies Retroactively to the Project and Does Not Violate the *Ex Post Facto* Clause.. .......................................................................16

        *1. In context, "claims" can only mean cases…......…..* 19

        *2. Congress repudiated* Allison Engine *with clear intent for full retroactivity.* ..................................................24

        *3. Applying § 3729(a)(1)(B) does not violate the* Ex Post Facto *Clause.* ...........................................................28

    B. Farfield Misclassified Its Employees. .........................34

        *1. No clear error in finding that groundmen were not "assisting" linemen.*....................................................34

        *2. Local industry practice controls the propriety of worker classification.* ................................................35

    C. Farfield's False Certified Payrolls Were Material. ......42

        *1. Proper classification and accurate certified payrolls were payment conditions.*...........................................44

        *2. No evidence of past relevant Government (in)action.* 50

        *3. Davis-Bacon compliance was essential to the bargain………………………………………………..52*

D. The Facts Support the District Court's Finding of Recklessness. ..................................................... 55

   1. *The testimony supported the District Court's recklessness finding.* ............................................ 56

   2. *No clear error based on DOL audit.* ...................... 57

   3. *Farfield's other arguments fail.* ............................ 58

E. The District Court Properly Shifted the Burden of Proof on Damages to Farfield. ............................................ 60

   1. Mt. Clemens *applies in an appropriate FCA case, like this one.* ............................................................... 61

   2. *Local 98's evidence was sufficiently representative* …….. ..................................................... 65

F. The Award of Attorneys' Fees Was Reasonable. ....... 67

**VI. Conclusion** ................................................................ 69

———————————————————

OPINION OF THE COURT

———————————————————

SMITH, *Chief Judge*.

Contractors on most federally funded construction projects must pay their workers a minimum wage based on the type of work they perform. The Department of Labor (DOL) usually sets those prevailing wage rates for each classification of worker needed on such a project. A contractor who bids on a project knows well that compliance with these regulations is required. And once it commences work, the contractor knows that it must also certify its compliance on payrolls supporting invoices for payment.

If a contractor misclassifies workers—thereby paying them less than required—the federal government may withhold funds in an amount proportionate to the affected work. The DOL is usually the forum for adjudicating claims of misclassification, for misclassified employees to recover underpaid wages, and for aggrieved contractors to assert entitlement to withheld funds.

But a contractor found to have misclassified employees can also face collateral consequences. For example, its certifications of compliance with wage-and-hour regulations may have been false. And those same false certifications may, in turn, have been material to the Government's decision to pay invoices associated with the misclassified work.

So what happens when a contractor is sued under the False Claims Act for falsely certifying compliance, but the DOL declines to adjudicate the underlying issue of whether workers were misclassified? In this case, the results have been over a decade of litigation and a panoply of first-impression issues. We conclude that a 2009 amendment to the FCA's liability standard applies retroactively to cases, like this one, pending on or after June 7, 2008; that the record establishes the contractor's misclassification of its workers; that its false certified payrolls were material to the Government's decision to pay for the associated work; and that the burden-shifting framework for damages in Fair Labor Standards Act cases applies. We also reject the appellant-contractor's other arguments en route to affirming the challenged orders of the District Court.

## I.   LEGAL BACKGROUND

### A. The Davis-Bacon Act

The Davis-Bacon Act, "[o]n its face," is "a minimum wage law designed for the benefit of construction workers." *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 178 (1954). The Act was intended "to protect local wage standards by preventing contractors from basing their bids on wages lower than those prevailing in the area" where the work is to be done. *Univs. Res. Ass'n v. Coutu*, 450 U.S. 754, 773–74 (1981) (quotation omitted); *see* 40 U.S.C. § 3142(a). Its purpose was "to give local labor and the local contractor a fair opportunity to participate in [] building program[s]." *Coutu*, 450 U.S. at 774 (quoting 74 Cong. Rec. 6510 (1931)). To that

end, the Act requires contractors on most[1] federally funded infrastructure projects to pay employees minimum wages based on the DOL's determination of prevailing wages "for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the civil subdivision of the State in which the work is to be performed." 40 U.S.C. § 3142(b).

Per DOL regulations, *see* 29 C.F.R. pts. 1, 5, 7, prevailing wage determinations are typically promulgated at the county level, 29 C.F.R. § 1.7(a), often based on survey data of wages paid or local collective bargaining agreements. *See* 40 U.S.C. § 3142(b); 29 C.F.R. § 1.3(b). Though the determinations sometimes don't include detailed information about the duties covered by each job classification, the DOL's regulations provide that "[a]ll questions relating to the application and interpretation of wage determinations (including the classifications therein) . . . shall be referred to the Administrator for appropriate ruling or interpretation." 29 C.F.R. § 5.13; *see also Coutu*, 450 U.S. at 760–61 ("Disputes over the proper classification of workers under a contract containing Davis-Bacon provision must be referred to the Secretary for determination." (citations omitted)).

Shirking Davis-Bacon obligations can have dire consequences. For example, covered contracts must provide for the Government's withholding from the contractor as much of the accrued payments as is necessary to pay the workers the difference between the required wages and those paid. *See* 40 U.S.C. § 3142(c)(3). And if the contractor is found to have failed to

---

[1] The Act does not apply to federally funded construction contracts of $2,000 or less. *See, e.g.*, 40 U.S.C. § 3142(a).

pay the specified prevailing wages, the Government "by written notice . . . may terminate the contractor's right to proceed with the work or the part of the work as to which there has been a failure to pay the required wages." § 3143 (providing also that contractor and its sureties "shall be liable to the Government for any excess costs the Government incurs"). When a contractor is determined to have "disregarded" its Davis-Bacon obligations to employees or subcontractors, it is barred from federal contracts for three years. *See* § 3144(b).

## B. The False Claims Act

The False Claims Act (FCA) imposes civil liability for making a false or fraudulent "claim," or a false record or statement material to such a claim, to obtain payment from the federal government. 31 U.S.C. § 3729(a)(1)(A)–(G), (b)(2). Both the Justice Department and private parties (called "relators") may bring an FCA action. The FCA imposes civil penalties on a per-violation basis plus three times actual damages, § 3729(a)(1), and authorizes recovery of a relator's attorneys' fees, § 3730(d)(1)–(2).

In 2008, the Supreme Court held in *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008), that liability under (former) § 3729(a)(1) required a defendant's direct presentment of the false claim to an officer or employee of the Government and that liability under (former) § 3729(a)(2) required proof of the defendant's specific intent to defraud the Government. *Id.* at 668–72. To "clarify and correct [those] erroneous interpretations of the [FCA]," S. Rep. No. 111-10, at 10 (2009); *see also id.* at 4, Congress amended the FCA in the Fraud Enforcement and Recovery Act of 2009 (FERA). Pub. L. No. 111-21, § 4, 123 Stat. 1625. FERA eliminated (a)(1)'s

-4-

requirement that the false claim be presented "to an officer or employee of the United States" and amended (a)(2) to remove the language that the Supreme Court had read to require specific intent to defraud the Government. *See, e.g.*, Pub. L. No. 111-21, § 4; S. Rep. No. 111-10 at 11.

FERA also amended the FCA to make clear that liability under the renumbered § 3729(a)(1)(B) (formerly (a)(2)), as well as another subsection not relevant here, requires that the false statement be material. So (a)(1)(B) liability now attaches when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). After FERA,[2] materiality means "having the tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4). And "knowingly" embraces actual knowledge of the false information, deliberate ignorance of its truth or falsity, and reckless disregard of its truth or falsity. *See* § 3729(b)(1)(A).

Given FERA's substantive changes to the sweep of FCA liability, Congress anticipated that disputes would arise over how to apply the amendments to conduct pre-dating FERA's date of enactment. So Congress promulgated the following "Effective Date and Application" provision in section 4(f) of FERA:

---

[2] We have recognized that FERA's materiality "changes merely made explicit and consistent that which had previously been a judicially-imposed, and oftentimes conflicting, standard." *U.S. ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 761 (3d Cir. 2017).

The amendments made by this section shall take effect on the date of enactment of this Act [May 20, 2009] and shall apply to conduct on or after the date of enactment, except that—

> (1) subparagraph (B) of subsection 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date; and

> (2) section 3731(b) of title 31, as amended by subsection (b); section 3733, of title 31, as amended by subsection (c); and section 3732 of title 31, as amended by subsection (e); shall apply to cases pending on the date of enactment.

Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625 (codified at 31 U.S.C. § 3729 note) [hereinafter "FERA § 4(f)"]. So the new liability standard in § 3729(a)(1)(B) for "knowingly . . . caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim," took effect "as if enacted on June 7, 2008, and appl[ies] to all claims under the [FCA] . . . pending on or after that date." The June 7, 2008 effective date is two days before the Supreme Court issued its decision in *Allison Engine*.

## II.    FACTUAL BACKGROUND

The Farfield Company is an open-shop construction company based in Lititz, Pennsylvania. It contracted with the Southeastern Pennsylvania Transportation Authority (SEPTA)

for a track and signal improvement project on a 7.5-mile stretch of railroad track running from the Wayne Junction station to the Glenside station in the Philadelphia area ("the Project"). The federal government partially funded the Project. Work began in 2002 and concluded in 2007.

The contract between Farfield and SEPTA was executed in 2002 and valued at $54.7 million. It included several provisions required by federal regulation, addressing how Farfield was to classify and pay its workers. For example, the contract provided that "[a]ll laborers and mechanics employed or working upon the site of the work . . . will be paid . . . at rates not less than those contained in the [incorporated] wage determination." A821[3]; *see* 29 C.F.R. § 5.5(a)(1)(i). It also required that workers "be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed, without regard to skill." *Id*. And "[l]aborers or mechanics performing work in more than one classification may be compensated at the rate specified for each classification for the time actually worked therein: provided, that the employer's payroll records accurately set forth the time spent in each classification in which work is performed." *Id.*

The DOL's prevailing wage determinations incorporated into the contract derived from the rates specified in local collective bargaining agreements ("CBAs"). The prevailing wage determinations referenced a CBA executed on December 3, 2000, between a contractors' association and Local 126 of

---

[3] Citations preceded by "A" refer to Appellant Farfield's Appendix submitted on appeal.

the International Brotherhood of Electrical Workers (IBEW),[4] and listed certain relevant worker classifications and their associated minimum rates of pay: "groundman" ($19.34 hourly plus fringes), "lineman" or "journeyman lineman" (total cash equivalent of $41.34 hourly), and "electrician" (total cash equivalent of $46.83 hourly). A832. From a May 1, 2001 CBA involving a separate laborers union, the prevailing wage determinations derived the classification of "laborer," paid at a $32.70 cash equivalent for those able to lay "conduit and duct" and a $32.50 cash equivalent for laborers classified as "[y]ard workers." A838.

The contract also required that Farfield submit to SEPTA for transmission to the Federal Transit Administration (FTA) a copy of Farfield's certified payroll, setting out all the information required to be maintained under various provisions of the Davis-Bacon Act.[5] In each week's certified payroll, Farfield had to include a "Statement of Compliance" averring, among other things, that the information in the payroll was correct and complete and that each worker "has been paid not less

---

[4] Local 126 represents electrical workers in the Philadelphia area who perform electrical work outside a property line. Local 126 organizes this "outside" work in the railroad track area, such as the work on the Project.

[5] For example, under 29 C.F.R. § 5.5(a)(3)(i), "payrolls and basic records related thereto shall be maintained by the contractor during the course of the work and preserved for a period of three years thereafter for all laborers and mechanics working at the site of the work," which records "shall contain" each worker's "correct classification," "hourly rates of wages paid," and "actual wages paid."

than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the Contract." A824; 29 C.F.R. § 5.5(a)(3)(ii)(B). Critically, "falsification" of a payroll certification could subject Farfield to criminal penalties or civil liability under the FCA. A824; § 5.5(a)(3)(ii)(D).

A few years before the Project, Farfield formed a transit division with the objective of obtaining contracts for rail work. To that end, it hired Joseph McGee, Sr. to be vice president of the new division because of his expertise in "captur[ing]" rail work. A1823–24. McGee's background included work with groundmen and linemen—experiences no one else at Farfield possessed when he was hired. Farfield relied on McGee to ensure that employees were properly classified based on the work they performed on the Project. Yet under McGee's management, Farfield's forepersons exercised unfettered discretion over which individual employee would perform which tasks on Project job sites. Neither Farfield nor McGee instructed them on how to classify workers on rail projects.

Farfield used daily "phase codes" internally to track labor, material, insurance, tax, overhead, subcontracting, and other costs of the Project. Farfield's forepersons tracked labor on the Project by recording on handwritten or typed timesheets the daily hours an employee had worked and associating those hours with a particular phase code.[6] These codes were applied irrespective of whether an employee was physically working

---

[6] Other than preparing these timesheets, Farfield did not document the work that a particular employee performed on the Project on any given day.

-9-

or, instead, attending briefings, traveling to and from the worksite, or waiting for trains to pass. Each week, forepersons were given prepared sheets—reflecting information generated by Farfield's corporate offices—that set forth phase codes associated with work needed on the Project, with a blank space for the foreperson to insert a phase code not already printed on the sheet. Forepersons prepared daily reports noting the work done by their crews as well as the number of workers in each classification who were part of a crew. But these reports did not identify which workers (or classifications of workers) performed which of the tasks embraced by the phase codes marked on the sheets.

In September 2004, about midway through the Project, a DOL auditor reviewed some of Farfield's certified payrolls and spoke with one of the company's vice presidents as well as certain employees not identified in the record. After reviewing one particular payroll, the auditor asked the vice president, who in turn consulted McGee, why certain employees had been paid at the "yard worker" laborer category rather than the slightly higher-paying laborer category. A1028 (mentioning "laying conduit"). But besides finding that four carpenters who worked on Labor Day had been paid at the Farfield shop rate—instead of the higher rate for holidays demanded by the SEPTA contract—the DOL auditor unearthed no wage-and-hour violations. Farfield paid $811.52 in holiday-pay arrears to the four carpenters.[7]

_____

[7] On a few occasions, an unidentified SEPTA employee met with Farfield workers on the Project about their work and pay rates.

SEPTA made full payment of all monies that Farfield was due under the contract, with some funds ultimately reimbursed to SEPTA by the FTA. On September 18, 2007, Farfield submitted its final bill to SEPTA for the Project. The bill was paid in early December of the same year.

### III.   PROCEDURAL BACKGROUND

A business manager at IBEW Local 98[8] suspected that Farfield had won several government contracts with low bids by intending to pay less-skilled workers, such as groundmen, to perform certain work that would otherwise have been the bailiwick of higher-skilled (and higher-paid) workers, such as linemen.[9] So the business manager requested copies of Farfield's certified payrolls. His concerns unmollified, the business manager then contacted someone at Local 126 to discuss the Project. Local 98's business manager and its attorneys eventually met to discuss worker classification issues with eight Farfield employees who had worked on the Project.

On September 17, 2009, Local 98 filed a sealed *qui tam* FCA complaint in the Eastern District of Pennsylvania. Local 98 alleged that, on the Project and four others, Farfield had schemed to intentionally pay wages lower than required by the

---

[8] Local 98 represents electrical workers in the Philadelphia area who perform electrical work inside a property line. Little, if any, such "inside" work was performed on the Project.

[9] Groundmen lack an apprenticeship program and had only to fill out an application to be hired by Farfield. Linemen receive 7,000 hours of field training as an apprentice, including training in aspects of conduit installation and electrical wire pulls.

Davis-Bacon Act and then to submit claims to the federal government for payment based on sworn certifications of compliance with the Act. About two years later, the United States Department of Justice elected not to intervene in the action. After the District Court unsealed the complaint and Local 98 served it, Local 98 amended its complaint to allege that Farfield submitted fraudulent certified payrolls to SEPTA, intending that SEPTA then use those documents to secure the federal government's payment on the projects.

Farfield moved to dismiss the amended complaint, arguing that the FCA did not apply to its contract with SEPTA and that the Court lacked subject-matter jurisdiction because the DOL had sole authority to adjudicate Davis-Bacon worker misclassifications. The District Court denied Farfield's motion and appointed a Special Master to manage the discovery that ensued. Despite arguing that the case did not require the DOL to resolve complex worker classifications, Local 98 eventually requested expert witnesses to prove industry classification practices. So in a September 26, 2017 order, the District Court referred the case to the DOL as a complex Davis-Bacon worker classification case. Then the case stagnated. Local 98 took no action until November 2018 when the District Court ordered it to effectuate the DOL referral. But the DOL declined the referral, refusing to investigate chiefly due to "the passage of time and the significant resources that would be necessary to investigate a closed contract." A183–84.

With the case once again before the District Court, Farfield filed a renewed motion to dismiss. The District Court denied it. Local 98 then withdrew its claims arising out of Farfield's work on four of the five projects, leaving only worker classifications on the Project to anchor its FCA suit. After

-12-

deposing Local 98's three experts, Farfield moved for summary judgment. The District Court denied that motion and directed the parties to select a Special Master to conduct the trial. The parties designated the same Special Master who had presided over discovery.

Local 98 sought to introduce before the Special Master six workers' testimony about their own work and that of others on the Project as representative proof for the entire set of 42 Farfield employees who, as groundmen or laborers, had their daily time logged under phase codes that purportedly signified lineman work. To the extent that Farfield's phase codes fail to capture the work its employees performed, Local 98 argued, the burden should shift to Farfield—as it does in collective actions under the Fair Labor Standards Act—to show the amount of non-lineman work performed under those codes. The District Court granted Local 98's motion to authorize this burden-shifting and, in an October 2019 order, held that the damages burden would shift to Farfield were the Special Master presented with such "representative" damages evidence. *See* A139–57.

In his Report & Recommendation ("R&R"), the Special Master made extensive findings of fact and conclusions of law based on the evidence at trial. He found that employees whom Farfield classified (and thus paid) as laborers and groundmen had performed lineman work under six Farfield phase codes by pulling wire and laying conduit. He determined that local practice does not permit laborers and groundmen to perform such tasks, as they are reserved for higher-paid linemen with electrical experience. Thus, the Special Master concluded, Farfield had falsely certified on payrolls submitted to the FTA that "the classifications set forth therein for each laborer or mechanic

conform with the work performed." A824 (Contract ¶ 7(c)(2)(b)).

Concluding that wage underpayments were the measure of FCA damages, and after shifting the burden of proof to Farfield to rebut Local 98's prima facie damages showing, the Special Master calculated $159,273.54 in total wage underpayments. Trebling under 31 U.S.C. § 3729(a)(1) brought the sum to $477,820.62. Because the misclassifications occurred during 105 workweeks, thus tainting 105 certified payrolls submitted to SEPTA and then the FTA, the Special Master found 105 FCA violations. He imposed the minimum civil penalty of $5,500 per violation "because Farfield did not intend to make a false statement, but did so recklessly," and because $577,500 (105 times $5,500) was still a weighty penalty in relation to the wage underpayments.[10] A322 (Conclusions of Law ¶ 36). The Special Master recommended a total judgment of $1,055,320.62. Local 98, the relator, could recover between 25 and 30 percent of the total judgment, 31 U.S.C. § 3730(d)(2), so the Special Master suggested that Local 98 be awarded 30 percent of the recommended judgment, or $316,596.19.

The District Court overruled Farfield's challenges to the R&R, adopting it in its entirety. The Court entered judgment against Farfield in the amount of $1,055,320.62: $738,724.43

---

[10] In 1999, the Justice Department adjusted FCA penalties for violations occurring after September 29, 1999 to account for inflation. For those violations, it increased the civil penalty range to between $5,500 and $11,000. 64 Fed. Reg. 47099, 47103–04 at § 85.3(9). The range and method for computing penalties were later revised, but not as relevant here.

-14-

to the United States and $316,596.19 to Local 98. In a subsequent order and supporting opinion, it partially granted Local 98's motion for attorneys' fees and costs, taxing $1,229,927.55 in fees and $203,226.45 in costs. Farfield's appeal followed.

## IV.  JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction over this action under 28 U.S.C. § 1331. We have jurisdiction to review the District Court's final orders under 28 U.S.C. § 1291.

A district court's findings of fact "must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). When the disputed factual finding is based on a credibility determination, "'even greater deference' is owed." *Alimbaev v. Att'y Gen. of U.S.*, 872 F.3d 188, 195 (3d Cir. 2017) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985)).

We review statutory constructions de novo. *United States v. Hodge,* 948 F.3d 160, 162 (3d Cir. 2020). We review any mixed questions of fact and law de novo insofar as "the primary facts are undisputed and only ultimate inferences and legal consequences are in contention." *U.S. Gypsum Co. v. Schiavo Bros.*, 668 F.2d 172, 176 (3d Cir. 1981). But when the mixed questions immersed the district court in case-specific factual issues, our review is a deferential one for clear error.

-15-

*See U.S. Bank Nat'l Ass'n ex rel. CW Cap. Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967–69 (2018).

## V.    DISCUSSION

Farfield appeals the District Court's orders denying its initial and renewed motions to dismiss, referring the case to the DOL, denying its motion for summary judgment, shifting the damages burden of proof to Farfield, overruling its objections to and adopting the Special Master's R&R, and awarding attorneys' fees.  We treat Farfield's most substantial arguments at length and dispose of the remaining ones in short order.  We will affirm all the District Court's challenged orders.

### A. Section 3729(a)(1)(B) Applies Retroactively to the Project and Does Not Violate the *Ex Post Facto* Clause.

This appeal presents a threshold issue of first impression in our Circuit: whether 31 U.S.C. § 3729(a)(1)(B) applies retroactively to conduct antedating that provision's June 7, 2008 effective date.  Recall that FERA amended the provision to remove language that the Supreme Court had understood to require specific intent to defraud the Government.[11]  The District Court found that Farfield's reckless misconduct on the Project concluded by 2007, when its work terminated and the last invoice was paid.  And Local 98 did not sue until September 2009.  So judgment must be entered for Farfield if § 3729(a)(1)(B) does not apply retroactively to pre-June 7, 2008 conduct.

---

[11] It is undisputed that Farfield did not intentionally misclassify workers or intentionally falsify payroll certifications.

Our retroactivity analysis is sequential. We first look for an "unambiguous directive" from Congress to apply the statute retroactively. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 263 (1994). If there is one, we follow it—and our inquiry ends. *See id.*; *Mathews v. Kidder, Peabody & Co., Inc.*, 161 F.3d 156, 161 (3d Cir. 1998). But if the statute contains no express retroactivity command and normal rules of construction do not require that it have only prospective reach, we next ask whether applying the statute would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed?" *Id.* at 280; *see Mathews*, 161 F.3d at 160–61 (also citing *Lindh v. Murphy*, 521 U.S. 320, 324–29 (1997)). If so, the statute has "retroactive effect"—and our final task is to employ the strong presumption against applying such statutes to pending cases *unless* Congress manifested clear intent that the statute apply retroactively. *Landgraf*, 511 U.S. at 280; *Mathews*, 161 F.3d at 161, 166.

The critical language in FERA's retroactivity provision applies § 3729(a)(1)(B) to "all *claims* under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after [June 7, 2008]." FERA § 4(f)(1) (emphasis added). By designating a pre-enactment effective date for § 3729(a)(1)(B)'s new liability standard, Congress sought to apply the provision to *some* conduct predating its enactment. Accordingly, we are applying a statute that includes an "express command" to apply it retroactively. *Landgraf*, 511 U.S. at 280. The question is whether that command is limited in scope to conduct that occurred on or after June 7, 2008, or whether it embraces conduct—whenever occurring—challenged in a *lawsuit* initiated on or after June 7, 2008. If it does not extend to the latter, then only Congress's clear intent that § 3729(a)(1)(B) apply in such a manner

can rebut the presumption against retroactivity.  *See Landgraf*, 511 U.S. at 263, 280; *Mathews*, 161 F.3d at 161.[12]

Whether Congress used "claims" in the FCA-specific sense as "requests for payment" (*i.e.*, underlying conduct) or generically to mean "cases" has engendered a Circuit split. The Eleventh Circuit has interpreted FERA to apply § 3729(a)(1)(B) retroactively only to demands for payment that were pending on or after June 7, 2008.  *See Hopper v. Solvay Pharms.*, *Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009) ("[T]he word 'claim' in [FERA] section 4(f) . . . mean[s] 'any request or demand . . . for money or property,' as defined by 31 U.S.C. § 3729(b)(2)(A) . . . . While this *case* was pending on and after June 7, 2008, the relators do not allege that any *claims*, as defined by § 3729(b)(2)(A), were pending on or after June 7, 2008.'").  Fifth and Ninth Circuit decisions have endorsed *Hopper*, though with little analysis.  *See Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 n.4 (5th Cir. 2012) (adopting district court's conclusion that FERA "did not apply to conduct occurring before [its] enactment" and that its retroactivity provision did not apply "because Relator's 'claims' were not pending on June 7, 2008"); *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1051 n.1 (9th Cir. 2011) ("[FERA's] amendments do not apply retroactively to this case." (citing *Hopper*, 588 F.3d at 1327 n.3)); *but see U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 464 n.4 (5th Cir. 2015) ("[T]he 2009 version of

---

[12] The intermediate *Landgraf* step is met here: Section 3729(a)(1)(B)'s liability standard has "retroactive effect" because, by applying to substantive conduct completed pre-enactment, it "increase[s] a party's liability" for past conduct. *Landgraf*, 511 U.S. at 280.

§ 3729(a)(1)(B), which was formerly § 3729(a)(2), is retroactively applicable to the Rigsbys' false record count.").

By contrast, the Sixth and Seventh Circuits have rejected *Hopper*'s reading in thorough opinions, holding that Congress used the term "claims" in § 4(f) of FERA simply to mean cases or lawsuits. *See U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 637–41 (7th Cir. 2016); *Sanders v. Allison Engine Co., Inc.*, 703 F.3d 930, 936–42 (6th Cir. 2012). The Second Circuit has seemingly reached the same conclusion, though without detailed analysis. *See U.S. ex rel. Kirk v. Schindler Elev. Corp.*, 601 F.3d 94, 113 (2d Cir. 2010) (concluding that § 3729(a)(1)(B) applied "[b]ecause Kirk's claim was filed in March 2005, and was pending as of June 7, 2008"), *rev'd on other grounds*, 563 U.S. 401 (2011).

We agree with the more comprehensive decisions and conclude, following the Sixth and Seventh Circuits, that Congress used "claims" generically in FERA's retroactivity provision to mean cases or lawsuits. At any rate, Congress's intent to apply § 3729(a)(1)(B) to all cases pending on or after June 7, 2008 is sufficiently clear. Whether as an express command under the first step of *Landgraf*, or consistent with Congress's clear intent under the last *Landgraf* prong, FERA subjects Farfield's pre-2008 conduct to § 3729(a)(1)(B).

*1. In context, "claims" can only mean cases.* Proponents of limiting FERA's retroactivity, including Farfield, urge that the FCA's definition of "claim" controls Congress's use of "claims" in § 4(f)(1). But the mere fact that "claim" is a defined term does not mean that it is used in that technical sense every time it appears in the statute. "A given term in the same statute may take on distinct characters from association

-19-

with distinct statutory objects calling for different implementation strategies." *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007). With "several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation, without being confused or getting confusing," the word "claim" eschews the presumption of uniform usage. *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004). Indeed, § 4(f)(1) speaks of "claims *under the False Claims Act*," and FERA elsewhere uses "claims" as synonymous with cases. So Congress did not use "claims" in its technical sense in FERA's retroactivity clause.

First, in the specific context of the retroactivity provision, replacing "claims" with the word's technical definition "makes no sense." *Kmart*, 824 F.3d at 640. Doing so yields this: "all request[s] or demand[s], whether under a contract or otherwise, for money or property . . . under the [FCA] that are pending on or after June 7, 2008." It would be anomalous for Congress to say that a request for payment is submitted "under" a statute that only comes into play if the request violates (or is alleged to violate) it. *See, e.g.*, Matthew Titolo, *Retroactivity and the Fraud Enforcement and Recovery Act of 2009*, 86 IND. L.J. 257, 289 (2011). The FCA and its liability standards are more naturally understood to apply only once an allegedly fraudulent request for payment is made, and a civil action filed. *Sanders*, 703 F.3d at 938 & n.3; *see Kmart*, 824 F.3d at 640 ("Rather, a claim 'under the [FCA]' is a legal action by the government or a relator to recover fraudulently obtained funds." (alteration in original) (citations omitted)). To harmonize the technical definition of "claims" with the retroactivity clause, one must exclude the later phrase "under the False Claims Act." That we are loath to do. *See, e.g.*, *Colautti v. Franklin*, 439 U.S. 379, 392 (1979) ("[A] statute should be

-20-

interpreted so as not to render one part inoperative." (citation omitted)); *United States v. Bass*, 404 U.S. 336, 344 (1971) ("[C]ourts should interpret a statute with an eye to the surrounding statutory landscape and an ear for harmonizing potentially discordant provisions . . . ."). The generic reading of "claims," on the other hand, avoids rendering superfluous the phrase "under the False Claims Act."[13]

Second, interpreting "claims" to mean legal actions reflects the broader statutory landscape. The FCA uses "claims" synonymously with "cases." *See, e.g.*, 31 U.S.C. § 3730(c)(5) ("the Government may elect to pursue its claim"); § 3730(d)(1) (discussing relator's right to receive "proceeds of the action or settlement of the claim"); § 3730(d)(2) ("the person bringing the action or settling the claim"); § 3730(d)(4) ("if . . . the court finds that the claim of the person bringing the action was clearly frivolous"); § 3731(c) ("to clarify or add detail to the claims in which the Government is intervening and to add any additional claims"); § 3732(b) ("Claims Under State Law"). Indeed, when the FCA uses the term in its technical sense, "claim" usually comes after "false" or "fraudulent." *See* Titolo, *Retroactivity*, at 291.

Granted, the second retroactivity clause of § 4(f) of FERA uses the word "cases." *See* FERA § 4(f)(2). But the negative contextual implication that Farfield would have us

---

[13] A common generic definition of "claim" is "[a]n interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; cause of action." *Claim,* BLACK'S LAW DICTIONARY (11th ed. 2019).

-21-

draw—that Congress's disparate use of "claims" in the preceding subsection reflects a different intent—is unreasonable.

To begin with, "the presumption that 'disparate inclusion or exclusion' is purposeful is weakened when, as here, the provisions were not joined together or considered simultaneously." *Kmart*, 824 F.3d at 641 (quoting *Sanders*, 703 F.3d at 937) (citation omitted).  On the contrary, §§ 4(f)(1) and 4(f)(2) of FERA were drafted by different chambers of Congress, at different times.  S. 386, 11th Cong. § 4(b) (as reported in Senate, March 5, 2009); S. 386, 11th Cong. § 4(f) (House engrossed amendment, May 6, 2009); *see also* Titolo, *Retroactivity*, at 300.  This drafting history undermines any negative inference that Congress's differing word choice in the two subsections signals a different intention.

What's more, §§ 4(f)(1) and 4(f)(2) of FERA "address wholly distinct subject matters." *Martin v. Hadix*, 527 U.S. 343, 356 (1999).  So we should not infer that Congress's use of different terms in the two sections is meaningful.  Start, as did the *Hadix* Court, with *Lindh.*  There, the Court concluded that Congress's use of disparate language regarding pending-case applicability in two adjacent chapters was intentional because the two chapters addressed overlapping subject matter: "new standards for review of habeas corpus applications by state prisoners" and "new standards for review of habeas corpus applications by state prisoners under capital sentences." *Hadix*, 527 U.S. at 356 (citing *Lindh*, 521 U.S. at 329).   In *Hadix,* by contrast, the Court concluded that no such inference followed from disparate pending-case applicability language in two adjacent provisions because the two provisions covered different subject matters: "the propriety of various forms of relief and . . . the immediate termination of ongoing relief

-22-

orders," in the first, and "the award of attorneys' fees," in the second. *Id.* at 356–57. What was true in *Hadix* is true here: The relevant provisions of FERA concern different subject matters. Section 4(f)(1) discusses retroactive application of the new liability standard in § 3729(a)(1)(B). By contrast, § 4(f)(2) of FERA deals with entirely different subject matter: the retroactivity of changes to FCA provisions relating to procedure and jurisdiction. *See* 31 U.S.C. §§ 3731 ("False claims procedure"), 3733 ("Civil investigative demands"), and 3732 ("False claims jurisdiction"). Concern for the first's retroactivity would thus not necessarily have mirrored that for the second's, so we cannot say that Congress's disparate use of words was intentional.

Tools of statutory interpretation leave us, then, with a provision that admits of only "one interpretation." *INS v. St. Cyr*, 533 U.S. 289, 316–17 (2001) (quoting *Lindh*, 521 U.S. at 328 n.4). By using concrete temporal language ("pending on or after") linked to a pre-enactment date and a word ("claims") whose only logical meaning in context is as a synonym for "cases," § 4(f)(1) of FERA expressly commands that the new liability standard in § 3729(a)(1)(B) apply to conduct challenged in a case pending on or after June 7, 2008.[14] *See, e.g.*, *St. Cyr*, 533 U.S. at 318–19 (identifying amendment's express application to "conviction[s] . . . entered before, on, or after" enactment date as clear retroactivity statement (internal quotation marks omitted)); *Hadix*, 527 U.S. at 355 (language

---

[14] *Landgraf*'s presumption against retroactivity does not trump other interpretive principles. *Lindh*, 521 U.S. at 324–26. So in deciding the scope of Congress's express command, we do not impose a higher bar for legislative clarity than in other contexts demanding a clear statement.

-23-

applying section "to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title," was clear statement (quotation omitted)); *Graham v. Goodcell*, 282 U.S. 409, 418–419 (1931) (clear statement rule satisfied where new tax refund statute "expressly applied to internal revenue taxes" assessed before pre-enactment date certain).

*2. Congress repudiated* Allison Engine *with clear intent for full retroactivity.* Even if § 4(f)(1) lacks an express command to apply § 3729(a)(1)(B) retroactively to cases pending on or after June 7, 2008, FERA otherwise shows Congress's clear intent to subject to the new provision relevant conduct, whenever occurring, that was subject to a lawsuit pending on or after that date. That clear intent suffices to rebut the presumption against retroactively applying § 3729(a)(1)(B) in such a manner. *See, e.g.*, *Landgraf*, 511 U.S. at 272–73, 280; *Mathews*, 161 F.3d at 166–70.

The Supreme Court's decision in *Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994), is instructive. At issue was the retroactivity *vel non* of § 101 of the Civil Rights Act of 1991, which defines "make and enforce contracts" in 42 U.S.C. § 1981 to include "the making, performance, modification, and *termination of contracts*, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b) (emphasis added). Section 101 was passed in the wake of *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), which held that § 1981 "does not apply to conduct which occurs after the formation of a contract." *Id.* at 171. Section 101 thus enlarged the category of conduct that is subject to § 1981 liability to include all aspects of the contractual relationship, including termination. *Rivers*, 511 U.S. at 303.

-24-

The *Rivers* petitioners, garage mechanics covered by a collective-bargaining agreement who were allegedly fired in 1986 for racially discriminatory reasons, argued that § 101 of the 1991 Act applied retroactively because their appeal was pending at the time of its passage.  *Id.* at 301–03.

In rejecting the petitioners' arguments, the *Rivers* Court contrasted the 1991 Act with a prior version of the bill that the President had vetoed.  The Court stated that Congress clearly intended for the vetoed bill to apply retroactively: Its express purpose was to "respond to the Supreme Court's recent [*Patterson*] decision[] by restoring the civil rights protections that were dramatically limited [there]by."  *Id.* at 307–08 (quoting S. 2104, § 2(b)(1) (alterations omitted)).  The section of the bill responding to *Patterson* was titled "Restoring Prohibition Against All Racial Discrimination in the Making and Enforcement of Contracts."  511 U.S. at 307 (quoting S. 2104, § 12).  The bill also included a provision establishing "that the amendment to § 1981 'shall apply to all proceedings pending on or commenced after' the date of the *Patterson* decision."  511 U.S. at 307–08 (quoting S. 2104, § 15(a)(6)).[15]

By contrast, the statute enacted in 1991 lacks comparable language about its application to pending proceedings, describes its function as "*expanding* the scope of relevant civil rights statutes" rather than *restoring* pre-existing rights, and "lacks any direct reference to cases arising before its enactment, or to the date of the *Patterson* decision."  511 U.S. at 308 (quoting Act of 1991 § 3(4), 105 Stat. 1071).  So the Court

---

[15] The *Rivers* Court also discussed legislative history.  *See, e.g.*, 511 U.S. at 306 n.6, 308.  We rest our decision solely on the text of FERA and the implications following directly from it.

could glean from the 1991 Act only that it was passed in response to *Patterson*. *See id.* at 308–09; *see also id.* at 304–05 (noting that legislatively overruling Supreme Court decision, without more, does not "reveal whether Congress intends the 'overruling' statute to apply retroactively to events that would otherwise be governed by the judicial decision").

Like the vetoed bill in *Rivers* that sought to "restore" pre-existing rights supposedly trammeled by a Supreme Court decision, FERA's amendments to the FCA after *Allison Engine* are expressly meant "to reflect the original intent of the law." FERA § 4(f) (heading). And in setting § 3729(a)(1)(B)'s effective date as June 7, 2008—a Saturday, and two days before the decision—Congress abrogated *Allison Engine*'s construction of what was then § 3729(a)(2) to the fullest possible extent "without reopening judgments that were already final when *Allison Engine* was decided." *Kmart*, 824 F.3d at 640; *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217–19 (1995) (explaining that Congress cannot reopen final judgments without triggering separation-of-powers concerns).

Conversely, Farfield's interpretation of "claims" would subvert Congress's intent to undo the effect of *Allison Engine* to the maximum extent possible. Indeed, on that reading, what significance would attach to Congress' May 2009 choice of a June 2008 date? Just as FCA defendants in prior cases could not explain Congress's choice of retroactivity date, *see, e.g.*, *Kmart*, 824 F.3d at 640 (concluding that Kmart's reading rendered June 7, 2008 date meaningless), Farfield fails to do so as well.

Reasons rooted in federal procedure also counsel against Farfield's reading. "When a new law makes clear that

-26-

it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly." *Plaut*, 514 U.S. at 226 (citations omitted). And even Farfield concedes that FERA's choice of a pre-enactment effective date for § 3729(a)(1)(B) means that Congress expressly commanded retroactivity, if only for underlying conduct occurring on or after June 7, 2008. But reading "claims" as the defined term would require post-FERA appellate courts to deviate from the *Plaut* rule when reviewing judgments related to pre-June 7, 2008 conduct, without a separate directive from Congress (or anyone else) to do so.

FERA's express purpose of "clarify[ing]" the FCA "to reflect the original intent of the law" and the pre-enactment effective date chosen for § 3729(a)(1)(B) reveal Congress's clear intent that the provision be applied retroactively to all conduct, whenever occurring, that was the subject of a non-final lawsuit at the time of (or after) *Allison Engine*.

\*          \*          \*

There is no reasonable contextual reading of § 4(f) of FERA other than that it mandates applying § 3729(a)(1)(B) to cases pending on or after June 7, 2008. That makes it an express retroactivity command. At all events, Congress's stated purpose in passing FERA was to reinstitute the FCA's "original intent" rather than expand its coverage, something highlighted by its pre-enactment date preceding *Allison Engine* by two non-business days. Reading "claims" as "cases" reflects that intent and recognizes Congress's overruling of *Allison Engine* to the fullest extent allowed by the Constitution.

-27-

*3. Applying § 3729(a)(1)(B) does not violate the* Ex Post Facto *Clause.* To be sure, even a law that Congress intended to apply retroactively may offend the Constitution's *Ex Post Facto* Clause or otherwise fail to satisfy due process.[16] Farfield argues that retroactively applying § 3729(a)(1)(B)'s liability standard amounts to an unlawful *ex post facto* criminal penalty. We disagree, as have most federal courts to pass on such claims. *See, e.g.*, *Sanders*, 703 F.3d at 948; *see also U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 878–79 (D.C. Cir. 2010); *Genty v. Resolution Tr. Corp.*, 937 F.2d 899, 912 & n.7 (3d Cir. 1991) (recognizing that FCA's multiple damages provision is not punitive but provides for "liquidated damages to assure the plaintiff's full compensation" (citing *United States v. Bornstein*, 423 U.S. 303, 315 (1976)).

---

[16] Though Farfield stresses that its conduct here—reckless violations of worker-classification regulations—is inoffensive, it makes no argument that § 4(f) of FERA violates the Due Process Clause by failing to advance a rational legislative purpose. *See, e.g.*, *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984). Any due process argument is thus forfeited. *See, e.g.*, *N.J. Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, 974 F.3d 486, 492 n.2 (3d Cir. 2020) ("argument . . . vaguely presented without legal or factual support . . . is forfeited"). And we would reject such a claim even if preserved because, as noted in *Sanders*, 703 F.3d at 948–49, Congress rationally sought to correct to the fullest extent what it deemed an erroneous interpretation of the FCA by passing FERA "to reflect the original intent" of its previously enacted legislation. FERA § 4 (heading).

Our Constitution provides that "[n]o Bill of Attainder or ex post facto Law shall be passed." U.S. CONST., art. I, § 9. This clause prohibits the enactment of any law that "retroactively alter[s] the definition of crimes or increase[s] the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). Applying the Clause requires us first to ask whether Congress "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for" a civil or criminal label. *Hudson v. United States*, 522 U.S. 93, 99–100 (1997) (quoting *United States v. Ward*, 448 U.S. 242, 248 (1980)).

Congress intended the FCA to impose a "civil penalty" plus three times the amount of damages sustained by the Government, and for a relator to bring a "civil action" on the Government's behalf for a violation. 31 U.S.C. § 3729(a). The Act also authorizes lawsuits brought in accordance with the Federal Rules of Civil Procedure, and imposes a preponderance-of-the-evidence standard of proof. §§ 3732(a), 3731(d). It could hardly be clearer that Congress "meant the statute to establish 'civil' proceedings." *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997).

That said, it is possible for a civil statute to be criminally punitive in effect. But a finding of punitive effect requires the "clearest proof" to override legislative intent based on factors such as

1) Whether the sanction involves an affirmative disability or restraint;
2) Whether it has historically been seen as punishment;
3) Whether it comes into play only upon a finding of scienter;

-29-

4) Whether its operation will promote the traditional aims of punishment—retribution and deterrence;
5) Whether the behavior to which it applies is already a crime;
6) Whether an alternative purpose to which it may rationally be connected is assignable for it; and
7) Whether it appears excessive in relation to the alternative purpose assigned.

*See Hudson*, 522 U.S. at 99–100 (citing *Ward*, 448 U.S. at 249; *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)). Taking these factors in turn, we conclude that Farfield has not shown by the "clearest proof" that retroactively applying § 3729(a)(1)(B) amounts to criminal punishment in violation of the *Ex Post Facto* Clause.

First, the FCA's treble damages and civil fines do not involve an affirmative disability or restraint because they do not restrict one's physical liberty similar to imprisonment. *See, e.g.*, *Myrie v. Comm'r, N.J. Dept. of Corr.*, 267 F.3d 251, 260–61 (3d Cir. 2011) (requiring comparison to "infamous punishment of imprisonment" (quoting *Flemming v. Nestor*, 363 U.S. 603, 617 (1960))). This factor does not favor characterizing the FCA as criminally punitive in effect.

Second, the sanction here—monetary penalties—has not historically been viewed as punishment. *See, e.g.*, *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 132 (2003) ("Treble damages certainly do not equate with classic punitive damages, which leave the jury with open-ended discretion . . . ."); *Hudson*, 522 U.S. at 104 ("payment of fixed or variable sums of money . . . ha[s] been recognized as enforc[ea]ble by

civil proceedings" (quotation omitted)).  The second factor too disfavors viewing the FCA as criminally punitive.

Third, the post-FERA FCA requires proof only of "reckless disregard" and thus penalizes acts committed without guilty knowledge.  31 U.S.C. § 3729(b)(1); *see United States v. Stadtmauer*, 620 F.3d 238, 255–56 (3d Cir. 2010) (defining "scienter" to include knowledge and willful blindness, but not recklessness).  Because the FCA does not come into play only upon a finding of (criminal) scienter, the third factor also suggests that the FCA's effect is civil.

Fourth, the FCA's operation does promote deterrence— one of the traditional aims of punishment.  Indeed, the original goal of the FCA was to stop massive frauds perpetrated by government contractors during the Civil War.  *See, e.g.*, *Bornstein*, 423 U.S. at 309.   But "all civil penalties have some deterrent effect."  *Hudson*, 522 U.S. at 102 (citations omitted).  If the fourth factor favors a determination that the FCA is criminally punitive in effect, then it does so only slightly.

Fifth, the conduct for which the FCA imposes sanctions may also bear criminal liability under 18 U.S.C. § 287.  But it's unclear which way this cuts.  On one hand, it might stand to reason that the FCA has a criminally punitive effect by targeting behavior that is already a crime.  *See, e.g.*, *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 365 (1984) (citing *Mendoza-Martinez*, 372 U.S. at 168–69).  On the other hand, the post-FERA FCA covers more conduct than does the criminal fraudulent-claims statute.[17]  *Sanders*, 703 F.3d at 946;

---

[17] Section 287 criminalizes "mak[ing] or present[ing] to any [federal official or agency] any claim upon or against the

-31-

*cf. 89 Firearms*, 465 U.S. at 366 ("Congress in fact drafted § 924(d) to cover a broader range of conduct than is proscribed by the criminal provisions of § 922(a)(1)."). And the separate existence of a criminal statute suggests that the civil statute serves a different purpose. *See, e.g.*, *Hudson*, 522 U.S. at 105. This factor thus carries neutral weight or, at best for Farfield, only slightly favors a determination of criminally punitive effect.

Sixth, the FCA's treble damages provision may be assigned a remedial (*i.e.*, compensatory) purpose. *See, e.g.*, *Chandler*, 538 U.S. at 130–31 (stating that "some liability beyond the amount of the fraud is usually 'necessary to compensate the Government completely'" and that "[i]n *qui tam* cases the rough difference between double and triple damages may well serve not to punish" (quoting *Bornstein*, 423 U.S. at 315)). After all, the FCA does not authorize the award of prejudgment interest or consequential damages, which typically accompany recovery for fraud. *See id.* at 131. Another unique purpose of the FCA's treble damages function is to incentivize private enforcement, "to quicken the self-interest of some private plaintiff who can spot violations and start litigating to compensate the Government, while benefitting himself as well." *Id.* (citation omitted) ("The most obvious indication that the treble damages ceiling has a remedial place under this statute is its *qui tam* feature with its possibility of diverting as much as 30 percent of the Government's recovery to a private relator who began the action."). This alternative remedial purpose supports a conclusion that the FCA operates civilly.

---

United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent." 18 U.S.C. § 287.

Seventh, although recovery can significantly exceed the pecuniary loss sustained directly as a result of the false claims—as it arguably did here—this does not mean that the FCA permits sanctions that are constitutionally excessive in relation to their civil compensatory purpose. Farfield makes much of statements by the Supreme Court that Congress has increased the FCA's civil penalties so that liability is "essentially punitive in nature." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 784–85 (2000). And it is true that the Supreme Court cited this language from *Stevens* in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). But other post-*Stevens* cases such as *Chandler*, *supra*, suggest that the Court does not view the *Stevens* characterization as exclusive and also endorses a "softe[r] . . . view of the role of the treble damages available under the FCA." *Sanders*, 703 F.3d at 948 (citing *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405–06 (2003)). The most we can say is that the seventh factor "weakly favor[s] a finding of punitive effect," *Sanders*, 703 F.3d at 948, making it only—at best for Farfield—the third factor (out of seven) to cut in that direction. And none of those three are strong indicators. So we lack the "clearest proof" necessary to override Congress's intent that the FCA be civil in nature.

\*     \*     \*

We therefore conclude that the FCA's treble damages and civil penalties do not violate the *Ex Post Facto* Clause so as to vitiate Congress's express command or, alternatively, clear intent that § 3729(a)(1)(B) apply retroactively to cases pending on or after June 7, 2008.

### B. Farfield Misclassified Its Employees.

Farfield next contends that the District Court erred in adopting the Special Master's conclusion that it misclassified certain of its employees as groundmen and laborers when what they actually performed was lineman work. First, Farfield urges, the record shows that a lineman was present on nearly every job site on the Project and, because a groundman was permitted to assist a lineman in performing all the relevant tasks, there was no misclassification. Second, Farfield presses that whatever the local industry practice, its worker classifications were proper because they did not violate Local 126's CBAs. Neither argument carries the day.

*1. No clear error in finding that groundmen were not "assisting" linemen.* The Special Master's factfinding disposes of Farfield's first contention because he found the relevant testimony of Farfield's witnesses "not . . . credible." A292 (Findings of Fact ¶ 144). Neither the Special Master's findings of fact, nor the District Court's adoption of his R&R, were clearly erroneous. Fed. R. Civ. P. 52(a)(6); *U.S. Gypsum Co.*, 333 U.S. at 395. The evidence did not support a finding that groundmen and laborers were simply helping linemen install conduit or pull wire. Testimony highlighted that many groundmen and laborers performed all tasks associated with conduit installation and wire pulling. Other proof told a similar tale. For example, most crews were not limited in the work they performed; forepersons did not receive any training or instruction from Farfield on how to assign workers of different classifications to different tasks; classifications played only a minor role in the assignment of work to members of a crew; and tasks associated with "installing conduit and pulling were

not performed by any particular classification" but by "all workers on a crew." A290–91 (Findings of Fact ¶¶ 133–41).

*2. Local industry practice controls the propriety of worker classification.* Farfield points out that nothing in contemporaneous CBAs negotiated by Local 126 restricted the work that a groundman could do, other than certain tasks not relevant here. These CBAs provided that the employer "ha[s] no restrictions, except those specifically provided for [herein], in planning, directing and controlling the operation of all his work [and] in deciding the number and kind of Employees to properly perform the work." A853. So Farfield protests that it could classify workers based on what it views as the CBAs' permissive approach to the duties of groundmen. But neither the case law nor DOL authority supports that proposition. Under the Davis-Bacon Act, Farfield's obligations flowed from *local industry practices* that sharply limited the range of electrical work that groundmen may perform.

Davis-Bacon decisions establish that "[w]age determinations implicitly include the locally prevailing practice of classifying jobs [and] [w]here collective bargaining agreements form the basis of wage determinations, *the practice of local signatory unions is conclusive*." *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1058–59 (D.C. Cir. 2007) (emphasis added) (citations omitted) (citing *In the Matter of Fry Bros. Corp.*, WAB Case No. 76-06, 1977 WL 24823, at *6 (June 14, 1977)).[18] And the DOL instructs that, when classifications are

---

[18] Circuits other than the D.C. Circuit follow *Fry Brothers*. *See, e.g.*, *U.S. ex rel. Plumbers & Steamfitters Loc. Union No. 38 v. C.W. Roen Const. Co.*, 183 F.3d 1088, 1093–94 (9th Cir. 1999).

-35-

unknown or disputed, "[i]f . . . the rates listed for all the classifications that may perform the work in question are union rates, the dispute will be resolved by examining *the practice(s) of union contractors in classifying workers* performing the duties in question on similar construction in the area (usually the same county)." U.S. DOL Field Ops. Handbook, Ch. 15, § 15f05(c)(5)(b) (emphasis added). The legal question as Farfield frames it, then, is whether local "practices" control even in the face of silent or potentially inconsistent CBAs.

Before reaching the merits of Farfield's argument, we first address a threshold issue. The DOL's wage determination incorporated into the contract prescribes wage rates for groundmen under "ELEC0126D 12/03/2000," which seemingly refers to a Local 126 CBA executed on December 3, 2000. A832. *See, e.g.*, *Abhe & Svoboda*, 508 F.3d at 1056 ("[T]he wages for painters, laborers, and carpenters were each based on union collective bargaining agreements; the relevant unions were noted in the wage determinations by their initials."); *id.* at 1056 n.1 ("[T]he general wage determination includes the initials PAIN0011C to indicate that wages for 'Painters (Bridge Construction)' were based on the wages established in a collective bargaining agreement signed by District Council 11 of the International Brotherhood of Painters and Allied Trades." (citation omitted)). But the earliest CBA in the record was executed December 3, 2001.[19] And though

---

[19] In response to a question at oral argument, counsel for Farfield stated that "[a]ll of the collective bargaining agreements are in the record," including "three that covered the time period of the project because it lasted four and a half years." OA Trans. 12:13–23; *see also id.* at 13:15–21. That is inaccurate, of course, inasmuch as no CBA relevant to the "laborer" clas-

-36-

they contain a classification for "groundhands," the Local 126 CBAs in the record include no classification of "laborer"; the "laborer" classifications in the wage determination appear to derive from a Laborers' Union CBA omitted from the record.[20] In other words, it is unclear whether the CBA on which the DOL's prevailing wage determinations and classifications were based contains the same "permissive" approach to

---

sification is before us. And though Farfield's employees worked on the Project from 2002–2007, the prevailing wage determination incorporated into the SEPTA contract associated the electrician worker classifications with the earlier December 3, 2000 CBA not in the record. Counsel represented at oral argument that "the relevant provisions didn't change," *id.* at 13:21–22, so we will consider Farfield's argument on the assumption that the subsequent CBAs in the record are indeed identical in relevant respects to the critical one cited in the prevailing wage determination.

[20] Confusingly, Farfield recognizes that "[t]he Laborers have their own collective bargaining agreement" and that "there isn't a collective bargaining agreement that governs both the Laborers and the IBEW," OA Tr. 14:24–25, 15:3–8, while also arguing that the relevant "classifications [are] all under one collective bargaining agreement." OA Tr. 16:3–7. While groundmen and linemen may have been classifications contemplated by the same Local 126 CBA, that cannot be said for laborers, whom the District Court also found were misclassified. So Farfield's CBA-based argument, at best, constitutes only a partial defense to the Special Master's findings that Farfield misclassified groundmen *and* laborers by having them perform lineman work (such as laying conduit and pulling wire).

groundman duties—to say nothing of "laborer" duties—as the later Local 126 CBAs included in the record.

In any case, Farfield's argument fails because it is not the language of a CBA but rather signatory parties' local practice that controls worker classifications under the Davis-Bacon Act. To that end, the DOL's Field Operations Handbook provides that when the applicable wage determination reflects union wage rates for the classifications involved, "the unions whose members may have performed the work in question" should be contacted "to determine whether the union workers performed the work on similar projects in the county in the year prior" to the relevant start date of the project. U.S. DOL Field Ops. Handbook, Ch. 15, § 15f05(d)(1)(a). "If *union contractors* performed the work, each union should be asked how the individuals who performed the work in question were classified." § 15f05(d)(1)(c). That information "provided by the unions should be confirmed with collective bargaining representatives of management," and "the area practice is established" only "[i]f all parties agree as to the proper classification of the work in question." § 15f05(d)(1)(d)–(e). The Handbook thus requires that a contractor, rather than simply reading a CBA to determine for itself whether a classification is prohibited, achieve consensus with both labor and management on how individuals who perform comparable work are *actually* classified.

Following the Handbook's dictates, the most comprehensive court decision on point similarly holds that local practices of the referenced CBA's signatories control Davis-Bacon

worker classifications.[21]  In *Abhe & Svoboda*, the D.C. Circuit held that wage determinations derived from CBAs require worker classifications to be "determined exclusively by the *practices* of signatory unions."  508 F.3d at 1059 (emphasis added) (citations omitted).  Farfield tries to minimize the import of this ruling, arguing that it doesn't elevate local practices over inconsistent terms of a CBA.  While we acknowledge that such a proposition was unnecessary to the D.C. Circuit's decision, large swaths of the opinion do, in fact, support such a holding in the case before us.

*Abhe & Svoboda* arose out of a contractor's classification of workers based on its own national "tools of the trade" analysis, which it claimed to have relied on for over 500 government contract jobs across the country.  508 F.3d at 1056.

---

[21] To be sure, two members of a Ninth Circuit panel held in *Roen* that "where the Department [of Labor] determines that prevailing wages are established by a collectively bargained agreement, the job classifications for the project or area at issue are also established by that agreement."  183 F.3d at 1093.  But the facts of *Roen* differed significantly from those we confront.  The relevant job tasks were enumerated in an inter-union agreement on how to classify piping workers on Northern California water treatment plant projects.  *See id.* at 1090–91.  By formal letter, the DOL adopted that agreement because it reflected "the appropriate classifications and wages for work done on water treatment projects in Northern California."  *Id.*  Not so here.  The CBAs in the record did not affirmatively establish the duties of groundmen other than merely prohibiting them from performing certain tasks.  Nor did the DOL so clearly and formally adopt the sparse work descriptions therein as the proper classifications on the Project.

The court held that this practice strayed from DOL regulations and practices establishing "that contractors do not have the authority to determine the scope of job classifications *based on their own methodologies*." *Id.* at 1061–62 (emphasis added). Noting the DOL's *Fry Brothers* decision, the court held that the contractor was on notice of the need to "follow the practice of the local unions." *Id.* at 1060–61 (citing *Fry Bros.*, 1977 WL 24823, at \*5–6). "From start to finish," the court noted, "the focus of the [Davis-Bacon] Act is on local practice" such that a contractor's application of its own classifications, even if based on a national standard, "is inconsistent with the fundamental principle of the Davis-Bacon Act that local practice should control government contracts." *Id.* at 1061. The court rejected a narrow construction of *Fry Brothers* that would have "require[d] only that contractors abide by *known union practices*," instead faulting the contractor "for not contacting the relevant unions or inquiring of the Department [of Labor] if it was unclear about the local practices for classifying jobs." *Id.* at 1062 (emphasis added) ("the Company made no effort to ascertain the practices of the unions noted in the wage determination").[22] And the court was unpersuaded by the arguments of amici that contractors should not be saddled with "break[ing] through the union wall to adequately and clearly determine their *invariably unwritten practices and rules*." *Id.* (emphasis added).

The takeaway from *Abhe & Svoboda* is straightforward. If the DOL's prevailing wage determinations rest on a particu-

---

[22] Contacting the union would have been especially fruitful for Farfield: The Local 126 business manager listed on every CBA is Thomas Leach, who served as Local 98's expert on local industry practices in this case.

lar CBA, then a contractor may not base classification practices on its own reading of that CBA.  Rather, it must engage with the signatory union(s) and management on local classification practices, even if "unwritten."  Failing that, the contractor may contact the DOL for clarification.

The evidence before the Special Master offers no quarter to Farfield.  Local 98's expert testified that under local practice "groundmen are not permitted to connect conduit; thread conduit; lay conduit; connect or splice conduit at a manhole; pull wire; monitor[] or address[] tension of a cable through a conduit; terminate a cable run; and perform splicing and/or stripping functions."  A83–84.  It is linemen who perform this work.  Farfield offered no compelling evidence on the issue.[23]  Farfield's assigning groundmen and laborers to perform such tasks—its logging their hours under phase codes that reflected

---

[23] Farfield states that Local 98's expert "admitted that under local union practice laborers also install and lay conduit and pull wire."  Appellant's Br. 28.  Though he acknowledged that members of other trades, such as laborers, do install conduit and pull wire, the expert testified that Local 126 is "adamantly against that" because such work "should be done by electrical workers and signatory electrical contractors."  A1653–54.  And he later clarified that on Local 126 jobs, laborers do not pull wires.  Farfield's own witnesses established that "under local area practices, only journeymen [linemen], and not laborers, could install conduit on transit projects."  A298 (Findings of Fact ¶ 169).  The Special Master thus found that "under local area practices in the Philadelphia area, only journeymen [linemen] may perform the tasks associated with installing electrical conduit" and "pulling electrical wires or cable."  A299 (Findings of Fact ¶¶ 170–71).

-41-

"journeyman [lineman] work, including installing electrical conduit [and] pulling electrical wires or cable," A303 (Findings of Fact ¶ 184)—conflicted with prevailing local practices and so amounted to misclassification of its workers.

\*     \*     \*

The District Court, via the Special Master, did not clearly err in finding any of the relevant facts. We reject Farfield's legal contention that it did not misclassify workers because one could read the relevant CBAs to permit its practices. Instead, whether workers were properly classified turns on the local practices of the CBA signatories. And the direct evidence showed that, under such practices, only linemen could lay conduit and pull wire. So the District Court correctly held that Farfield misclassified workers on the Project.

## C. Farfield's False Certified Payrolls Were Material.

A materiality inquiry under the FCA is a holistic, totality-of-the-circumstances examination of whether the false statement has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *see Escobar*, 136 S. Ct. at 2003–04. The Government's "decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive" of materiality. *Escobar*, 136 S. Ct. at 2003. While materiality "cannot be found where noncompliance is minor or insubstantial," it may be found where the Government "consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* In this context, as in all others,

-42-

materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002 (alteration in original) (quoting 26 R. Lord, WILLISON ON CONTRACTS § 69:12, p. 549 (4th ed. 2003)).

Farfield argues that even if it misclassified workers, it cannot be liable under the FCA because the false certified payrolls that it submitted to SEPTA, which SEPTA in turn submitted to the FTA, were not material to the Government's decision to pay.[24] This is so, Farfield claims, because (1) the contract language permitted, but did not require, the Government to withhold payment from SEPTA if work was misclassified or certified payrolls were false; (2) the Government took no action at various stages of the Project and this litigation; and (3) the total amount of underpaid wages due to misclassifications was small in relation to the overall value of the contract. But none of the relevant circumstances convince us that the false certified payrolls were immaterial to the Government's decision to pay invoices for Farfield's work.[25]

---

[24] Farfield does not dispute its obligations to classify workers properly and submit accurate payrolls containing a sworn certification of compliance. *See* 29 C.F.R. § 5.5(a)(3)(ii)(B).

[25] Farfield also contends that the false certified payrolls (submitted weekly) cannot anchor Local 98's FCA claim because they are not a "request or demand" for payment within the FCA's definition of "claims." Appellant's Br. 30, 50–53. Farfield argues that any FCA violations it committed must instead trace to (monthly) invoices affected by the worker misclassifications. Not so. Post-FERA, the FCA imposes a civil penalty on any person who "knowingly makes, uses, or causes to be made or used, *a false record or statement* material to a false or

*1. Proper classification and accurate certified payrolls were payment conditions.* After *Escobar*, the Government's designation of compliance with a particular regulatory requirement as a condition of payment is relevant to, but not dispositive of, materiality. 136 S. Ct. at 2003. The SEPTA contract incorporates several of the federal regulations pertinent to this

fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (emphasis added). Farfield's "false record or statement" was each certified payroll report (more specifically, each certification of compliance) submitted to the FTA to backstop the associated invoices. *See, e.g.*, *U.S. ex rel. Sheet Metal Workers Int'l Ass'n, Loc. No. 20 v. Horning Inv., LLC*, 828 F.3d 587, 591–92 (7th Cir. 2016) (highlighting evidence that defendant's employee "submitted the Certified Payroll Reports and the eight applications that initially went to [the prime contractor] with the knowledge that they were to be presented to the Department of Veterans Affairs for payment" (citation omitted)); *United States v. Saavedra*, 661 F. App'x 37, 45–46 (2d Cir. 2016) ("[N]othing in the [FCA] requires the court to impose penalties based on the number of false claims under § 3729(a)(1)(A), instead of the number of false statements under § 3729(a)(1)(B)."); *see also U.S. ex rel. Schwedt v. Planning Res. Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) (claim need not be an invoice but may be a progress report submitted to induce payment); *United States v. Bd. of Educ. of City of Union City*, 697 F. Supp. 167, 176 (D.N.J. 1988) ("Although each individual report did not trigger separate payments, the release of funds was predicated upon the grant agreement which required the periodic submission of accurate reports.").

materiality factor.  These provisions give the Government the unilateral right to exercise withholding and debarment remedies in response to Farfield's non-compliance with Davis-Bacon requirements.

First, the federal agency (here, the FTA) "*shall* upon its own action or upon [application] of the Department of Labor withhold or cause to be withheld from the contractor . . . so much of the accrued payments or advances as may be considered necessary to pay . . . the full amount of wages required by the contract."  29 C.F.R. § 5.5(a)(2) (emphasis added).

Second, "[i]n the event of failure to pay . . . all or part of the wages required by the contract, the (Agency) *may*, after written notice . . ., take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds until such violations have ceased."  *Id.* (emphasis added).

Third, if the contractor fails to maintain or submit required documents, the Government "*may*, after written notice . . ., take such action as may be necessary to cause the suspension of any further payment," with "failure to submit the required records" a permissible "grounds for debarment" for a three-year period.  29 C.F.R. § 5.5(a)(3)(iii) (emphasis added) (citing § 5.12); *see also* § 5.5(a)(3)(ii)(A)–(D) (describing required payrolls and certifications of compliance).

Still another regulation says that the Government "*shall*" suspend sufficient payments when a contractor fails "to comply with the labor standards clauses contained in § 5.5," 29 C.F.R. § 5.9 (emphasis added), but the relevant statute calls only for contractual stipulations that there "*may* be withheld

from the contractor so much of the accrued payments as the contracting officer considers necessary" to pay the required wages. 40 U.S.C. § 3142(c)(3) (emphasis added); *accord Coutu*, 450 U.S. at 757.

The parties spill more ink than necessary arguing whether the Government has a mandatory obligation to suspend payment when it learns of Davis-Bacon noncompliance or merely the right to do so. Farfield claims that the Government has discretion and thus that Davis-Bacon compliance is not a condition of payment, whereas Local 98 presses that the Government must withhold payment for noncompliance. There is scant case law interpreting whether the Government must withhold funds sufficient to make misclassified employees whole. *See, e.g.*, *Favel v. Am. Renovation and Const. Co.*, 59 P.3d 412, 420 (Mont. 2002) ("Whether [withholding was] discretionary or mandatory, the USAF Contracting Officer had the unilateral authority to make such a decision . . . ." (citing 29 C.F.R. §§ 5.5(a)(2), 5.5(a)(3)(iii), 5.9; 40 U.S.C. § 276a(a))).

We need not decide whether the Government lacks or indeed has discretion to withhold payment unilaterally. Its undisputed right to do so and to debar Farfield—combined with Farfield's relevant actual knowledge and the lack of evidence that the Government would overlook misclassification—support the conclusion that proper worker classification and, by extension, submission of payrolls accurately certifying the same were conditions of payment. Post-*Escobar*, courts decide whether regulatory compliance is an express condition of payment based on what the regulation *requires the defendant to do* under the federal contract or program, not

whether the Government must act in response.[26] *See, e.g.*, *U.S. ex rel. Prather v. Brookdale Sr. Living Communities, Inc.*, 892 F.3d 822, 831–33 (6th Cir. 2018). Here, that analysis supports the District Court's materiality finding.

Compliance with the relevant Davis-Bacon regulations was mandatory for Farfield to bid on the contract and for the Government to perform under it. Under those regulations, Farfield's workers "will be paid unconditionally . . . the full amount of wages . . . computed at rates not less than those contained in the wage determination." 29 C.F.R. § 5.5(a)(1)(i). Such workers "shall be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed." *Id.* They may be compensated for work performed in more than one classification only if "payroll records accurately set forth the time spent in each classification in which work is performed." *Id.* "Payrolls and basic records relating thereto shall be maintained by the contractor," and they "shall contain . . . [each worker's] correct classification" and "hourly rates of wages paid." § 5.5(a)(3)(i). And Farfield "shall submit weekly . . . a copy of all payrolls . . . to [SEPTA] for transmission to the [federal agency]," which "shall set out accurately and completely all of the information

---

[26] To the extent that Government action is relevant, it goes to the next *Escobar* factor we discuss below. If, for example, the Government exercised its discretion not to withhold payment—and instead paid in full—despite knowledge of misclassifications or false certifications, then that would cut against materiality, per *Escobar*. But the mere existence of remedial discretion alone does not mean that the regulatory compliance otherwise required of the defendant was not an express condition of payment.

required to be maintained under [(a)(3)(i), except Social Security numbers]." § 5.5(a)(3)(ii)(A). Each payroll "submitted shall be accompanied by a 'Statement of Compliance,' signed by the contractor . . ., and shall certify," among other things, that "each laborer or mechanic has been paid not less than the applicable wage rates . . . for the classification of work performed, as specified in the applicable wage determination incorporated into the contract." § 5.5(a)(3)(ii)(B).[27] If the contractor fails "to comply with the labor standards clauses in § 5.5" or "fails to submit the required records," the Government unilaterally may withhold funds and, for records non-compliance, debar the contractor for three years. § 5.5(a)(3)(iii); § 5.9. And all of the above provisions "shall" be "insert[ed] in full in any [covered] contract," § 5.5(a), making clear their centrality as contractual conditions.

Farfield's Davis-Bacon compliance and weekly submission of complete and accurate certified payrolls were thus designated conditions of the Government's obligation to perform (*i.e.*, pay) under the SEPTA contract. *See Prather*, 892 F.3d at 832–33; *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 713 (7th Cir. 2014) ("[A] reasonable jury could certainly find that these MDS [Minimum Data Sheet] forms were conditions of payment because they specif-

---

[27] The contract, the regulations, and Farfield's payroll certifications all provide that "falsification of any of the above certifications" may subject the contractor to criminal prosecution under 18 U.S.C. § 1001 or civil liability under the FCA. A824; 29 C.F.R. § 5.5(a)(3)(ii)(D); A1265. Given the contemplated FCA liability, the submission of payrolls falsely certifying Davis-Bacon compliance must, at least in some cases, be material to the Government's decision to pay.

ically affirm that reimbursement is 'conditioned on the accuracy and truthfulness of [the] information' contained in the forms. And such a certification of accuracy is required by the Medicare and Medicaid regulations." (last alteration in original) (citing 42 C.F.R. § 483.20)). That conclusion finds further support in the Government's recourse to debarment of a contractor that falsifies certified payrolls or otherwise disregards its Davis-Bacon obligations to employees. 29 C.F.R. § 5.12(a)(2); *see, e.g., Metro. Home Improvement Roofing Co.,* B-215945 (Comptr. Gen. Dec. Jan. 25, 1985). The express-condition-of-payment factor thus favors the District Court's conclusion that Farfield's submission of false certified payrolls was material to the Government's decision to pay. *Escobar*, 136 S. Ct. at 2003.

Even were we disinclined to call Davis-Bacon compliance an express or designated condition of payment here, testimony of Farfield's witnesses reveals actual knowledge that compliance was a de facto condition of both payment and Farfield's continued eligibility for federally funded projects. "The existence of express contractual language specifically linking compliance to eligibility for payment . . . is not, as [defendant] argues, a necessary condition" for materiality. *United States v. Sci. Apps. Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010). And the Supreme Court, endorsing a similar conception of materiality, recognizes that "[a] defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment." *Escobar*, 136 S. Ct. at 2001–02; *Sci. Apps.*, 626 F.3d at 1269 ("The plaintiff may establish materiality in other ways, such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue.").

-49-

As the District Court summarized, one of Farfield's vice presidents testified that he "understood if the DOL ever found Farfield to have . . . violated a prevailing wage act the consequence 'would have put us out of business.'" A103. McGee testified that, based on "a problem years prior," Farfield was "concern[ed]" at the Project's inception "that we used the proper people in the proper positions and certified payrolls were accurate." A1294. It was clear to McGee that "if there was a problem" with classification, it "would be a real problem." A1306. There was also evidence that Farfield had generally "been very sensitive to [prevailing wage laws]" and perceived itself as "'under a magnifying glass' by the union." A105. While a defendant's actual knowledge "that the Government would be *entitled* to refuse payment were it aware of the violation" is not dispositive of materiality, *Escobar*, 136 S. Ct. at 2004 (emphasis added), Farfield's clear appreciation that Davis-Bacon violations would "*likely*" so affect the "behavior of the recipient of the alleged misrepresentation" is enough to tilt the condition-of-payment factor in favor of materiality. *Id.* at 2002 (emphasis added) (quoting WILLISTON ON CONTRACTS, at 549).

*2. No evidence of past relevant Government (in)action.* The parties have pointed us to no record evidence showing that the Government "consistently refuses to pay claims in the mine run of cases based on noncompliance with" Davis-Bacon requirements or pays claims like those at issue here "despite its actual knowledge that certain requirements were violated." *Escobar*, 136 S. Ct. at 2003–04. So nothing suggests that this is a case where the Government would have knowingly paid invoices associated with false certified payrolls or, by extension, misclassified workers. *Cf. U.S. ex rel. Spay v. CVS*

*Caremark Corp.*, 875 F.3d 746, 764 (3d Cir. 2017) (summarizing evidence of Government's knowledge that pharmacy benefit managers were submitting claims that flouted regulatory requirements and its payment of such claims anyway). Left intact is Local 98's prima facie materiality showing based on the contract and regulations as well as the knowledge of Farfield decisionmakers. *See, e.g.*, *U.S. ex rel. Doe v. Heart Sol'n, PC*, 923 F.3d 308, 318 (3d Cir. 2019) (faulting defendants for failing to show "that Medicare generally pays this type of claim 'in full despite its actual knowledge that certain requirements were violated'" (quoting *Escobar*, 126 S. Ct. at 2003)).

In a *trompe l'œil*, Farfield paints the Justice Department's choice not to intervene in the litigation as a Government act that fatally undermines materiality. But intervention decisions are, at best, of minimal relevance. In *Escobar*, the Government chose not to intervene, *see* 136 S. Ct. at 1998, yet the Supreme Court did not mention this as a pertinent materiality factor. And "[if] relators' ability to [meet] the element of materiality were stymied by the government's choice not to intervene, this would undermine the purposes of the Act." *Prather*, 892 F.3d at 836 (citation omitted) (rejecting similar intervention argument); *cf. U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (listing non-intervention as one among many Government actions and inactions that undermined relator's materiality allegation). Nor do the "administrative mechanism[s]" for enforcing compliance with wage-and-hour laws weigh against materiality—at least not on the record we confront here. Appellant's Br. 32–33. The DOL declined to act on the District Court's referral of the case, mak-

ing that forum well and truly unavailable to Local 98.[28]  And it did so based on the vintage of the facts and related concerns for investigatory resources, not on any grounds suggesting immateriality.

*3. Davis-Bacon compliance was essential to the bargain.*  A third materiality factor is whether the noncompliance is "minor or insubstantial" or, instead, goes "to the very essence of the bargain."  *Escobar*, 136 S. Ct. at 2003 & n.5 (quotation omitted).  Farfield argues that its misclassification violations were small, calculated at just over $150,000 in wage underpayments, in comparison to the $54.7 million value of the SEPTA contract.  We refuse to measure materiality based only on the monetary value of Farfield's wrongdoing in relation to some larger, undefined whole.  After all, Davis-Bacon compliance is concerned *not* with minimizing costs but, on the contrary, aims to impose additional costs on contractors and the Government in pursuit of goals that Congress has prioritized for federally funded projects.

Holding otherwise would require us to engage in difficult, if not impossible, line-drawing.  Even if valuing the affected work were easy to accomplish—something belied by the history of this case—at what level of generality should we

---

[28] Farfield points to one tangential circumstance that it claims weighs against a materiality determination: SEPTA spoke with Farfield's workers during the Project but raised no concerns about worker classification.  The District Court found that these alleged conversations lacked the necessary specificity to sway its materiality finding.  We see no fault in that finding.  And, in any case, such discussions would fail to show the *Government's* (*i.e.*, the FTA's) knowledge of the noncompliance.

evaluate the materiality denominator?  Should we look at the ratio between the affected work and the overall amount of electrical work performed on the Project?  The overall dollar value of the Project?  The overall budget of the FTA while the work was performed? And then, even if we could formulate the correct denominator, what percentage of misclassified work in relation to that whole suffices to meet the materiality threshold?  0.1 percent?  One percent?  Ten percent?  A search for answers proves a Sisyphean task.  Neither Davis-Bacon nor case law provides a guide.

And opposite the dollar magnitude of the violation are other factors one might reasonably consider in evaluating whether a contractor's regulatory violations were minor or insubstantial.  We might ask, for example, about temporal duration:  For how long did the Davis-Bacon noncompliance affect the contractor's work?  Farfield falsely certified compliance 105 times—once a week for more than two years on the five-year Project.  Arguably, undercutting the local labor market for over two years is neither minor nor insubstantial.  Though we have no reason to think that any work on the Project was sub-standard, we might also consider in our objective materiality analysis the possible consequences to the public of unskilled workers building public infrastructure that local practices reserve for an electrician's skill and experience.  *Cf. Spay*, 875 F.3d at 764 ("The misstatements that gave rise to this qui tam action allowed patients to get their medication, and they are precisely the type of 'minor or insubstantial' misstatements where 'materiality . . . cannot be found.'" (alteration omitted) (quoting *Escobar*, 136 S. Ct. at 2003)).  Should the potential for widely felt negative consequences from public transit failure lower the dollar threshold for materiality in cases like this one?  One might even say that the Davis-Bacon Act's debar-

-53-

ment remedy implicitly recognizes that certain regulatory violations on public works projects should have ramifications for the contractor beyond wage restoration. And, of course, Davis-Bacon compliance is a keystone of federally funded construction projects. *See, e.g.*, *Coutu*, 450 U.S. at 771, 773–76; *Fry Bros.* at \*6. Whether a contractor "complied with the regulations" that are central to decisions about how to spend public funds "is a fact that a reasonable person would want to know." *Prather*, 892 F.3d at 835; *see also United States v. Luce*, 873 F.3d 999, 1007–08 (7th Cir. 2017) (misrepresentation that no officers of loan-originating company were currently subject to criminal proceedings was material because certification "addressed a foundational part of the Government's mortgage insurance regime, which was designed to avoid the systemic risk posed by unscrupulous loan originators").

In view of the totality of the circumstances, we conclude that Farfield's Davis-Bacon violations were not minor or insubstantial. Farfield misclassified more than $150,000 in electrical work on a public infrastructure project. The consequence was that, on 105 occasions across more than two years' worth of payrolls, Farfield falsely certified its compliance to the Government. And it did so under a regulatory regime and a contract that authorized debarment as a remedy for misclassification and false certifications. This *Escobar* consideration also favors a conclusion that Farfield's false statements were material to the Government's decision to pay SEPTA invoices.

\*     \*     \*

Proper worker classification and submission of accurate payroll certifications were express conditions of the Government's payment—or, at minimum, de facto conditions of pay-

ment based on Farfield's knowledge of the Government's likely response to non-compliance. And Farfield's regulatory violations were not minor or insubstantial. Seeing no evidence of relevant Government (in)action, we conclude that Farfield's false certified payrolls were material to the Government's decision to pay.

### D. The Facts Support the District Court's Finding of Recklessness.

The District Court adopted the Special Master's finding that Farfield recklessly ignored its worker classification obligations under the Davis-Bacon Act, and thus acted with reckless disregard for the truth or falsity of its certified payrolls. Under the FCA, an individual or entity responsible for submitting an objective falsehood must have acted "knowingly"— that is, with actual knowledge of the falsehood, in deliberate ignorance of its truth or falsity, or in reckless disregard of its truth or falsity. *See* 31 U.S.C. § 3729(b)(1)(A). Congress added the "reckless disregard" prong to the FCA's definition of "knowingly" to target the defendant who has "buried his head in the sand" and failed to make an "inquiry into the claim's validity" that is "reasonable and prudent under the circumstances." *U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 530 (6th Cir. 2012) (quoting S. Rep. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286).

The Special Master's essential conclusion from the facts was that Farfield, via McGee, delegated full discretion to forepersons to use workers on their crews as they saw fit while, at the same time, fully aware of Farfield's contractual and regulatory obligations to ensure that employees were paid prevailing wages for the classification of work performed. Farfield

-55-

raises a hodgepodge of factual objections that it claims render the recklessness finding erroneous, but none have merit.

1. *The testimony supported the District Court's recklessness finding.* Farfield contends that its forepersons and managers reasonably believed that groundmen could do whatever work linemen could do. They testified that McGee told them so. Transit work was not something that Farfield specialized in prior to undertaking the Project, and its supervisors may have understandably relied on McGee for direction. But Farfield's argument fails to grapple with the District Court's recklessness finding. For his part, McGee testified that a groundman *could not* do all the work that a lineman could, including specifically "pulling wire through conduit," A1338–39, because groundmen were "completely unskilled" "grunt[s]." A1313–14; A1341. So McGee's statements to subordinates that "any worker could do any task" such that they needn't worry about properly classifying groundmen, A291 (Findings of Fact ¶ 141), conflicted with his own knowledge of the proper role of groundmen and the centrality of proper classification to the health of Farfield's business.[29]

The District Court reasonably concluded from this conflicting testimony that McGee, and thus Farfield, recklessly delegated to unknowledgeable individuals the responsibility

_____

[29] A groundman could assist a lineman in most tasks, Farfield points out, and a lineman was usually included on a crew. But the Special Master found "not credible" the testimony of Farfield's witnesses that only linemen performed the skilled tasks involved, with groundmen "simply 'helping' [them] with the installation of conduit and pulling of wire." A292 (Findings of Fact ¶¶ 143–44); *see supra* Section V.B.1.

for ensuring that employees were properly classified. *See, e.g.*, *United States v. Krizek*, 111 F.3d 934, 941–42 (D.C. Cir. 1997) (observing that, although FCA is "not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are *prepared in such a sloppy or unsupervised fashion* that resulted in overcharges to the Government" (emphasis added) (quotation omitted)); *United States v. Stevens*, 605 F. Supp. 2d 863, 867, 869 (W.D. Ky. 2008) (finding "reckless disregard" of physician's duty as Medicare and Medicaid provider to "take reasonable steps to ensure that his clinic's claims for reimbursement [were] accurate" where physician "*completely delegated*" all billing responsibilities to someone with "*absolutely no prior experience with medical billing*" (emphases added)). That Farfield hired McGee for his knowledge of and experience with classifications on rail projects, or that other individuals may have been ignorant for their part, does not mean that Farfield is unaccountable for McGee's reckless actions. An entity's knowledge for FCA purposes may be imputed based on that of a particular employee or officer. *See, e.g.*, *Sci. Apps.*, 626 F.3d at 1272–73; *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 919–20 & n.11–12 (4th Cir. 2003).

2. *No clear error based on DOL audit.* Farfield next claims that the District Court's recklessness finding was clearly erroneous for glossing over the DOL's 2004 audit of the Project, which found only minor holiday-pay violations. But the District Court did indeed recognize that the DOL audit was "evidence going to whether a defendant acted in reckless disregard of wage and classification requirements." A81 (citing *U.S. ex rel. Rueter v. Sparks*, 939 F. Supp. 636 (C.D. Ill. 1996), *aff'd*, 111 F.3d 133 (7th Cir. 1997)). The audit evidence

simply wasn't compelling or specific enough to rebut the otherwise strong proof that Farfield acted recklessly. For instance, though the DOL auditor appears to have reviewed some payroll information, the record does not show that he examined information about the work that groundmen and linemen were actually performing. In fact, the limited evidence related to the audit suggested that the auditor's remit may have been much narrower than examining worker classification and prevailing wage compliance across the entire project.

*3. Farfield's other arguments fail.* Farfield throws additional facts at the wall, but none of them stick. Farfield contends that it could not have recklessly misclassified workers on the Project because Local 98 voluntarily dismissed its claims against Farfield related to four other projects. But that tells us nothing about recklessness as to the Project at issue. Nor does the Special Master's description of the case as entailing "close questions of fact and law" mean that Farfield could not have acted recklessly. Appellant's Br. 40–41. This case implicates fact-bound wage-and-hour issues and complex questions of law, including issues of statutory retroactivity, but nothing that would diminish Farfield's culpability.[30]

---

[30] Farfield's possible compliance with the CBAs' restrictions on groundman work does not vitiate the recklessness finding. Even if Farfield or McGee relied on the CBAs when making decisions relevant to how employees would be classified (which was not proven), "parties dealing with the government are expected to know the law, and there is no grave injustice in holding parties to a reasonable knowledge of the law." *Abhe & Svoboda*, 508 F.3d at 1060 (cleaned up). As suggested by our earlier treatment of Farfield's industry-practice argument, *supra* Section V.B.2, relying solely on the CBAs' lack of

Farfield also claims that it could not have recklessly disregarded its legal obligations so as to "cheat" or save money because it paid some employees wages higher than those required by Davis-Bacon and the SEPTA contract. Appellant's Br. 41–43. But even if that were true, it is irrelevant. To "establish[] liability under the FCA, a plaintiff need not prove the defendant had a financial motive to make a false statement relating to a claim seeking government funds." *Harrison*, 352 F.3d at 921 (citation omitted). There may well have been reasons for Farfield's recklessness besides aggregate profit. At all events, Farfield offers no legal support for offsetting amounts underpaid to certain employees with funds overpaid to others. *Cf. Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 332–35 (3d Cir. 2016) (declining to offset employer's FLSA liability for unpaid pre- and post-shift work with amounts paid for unproductive lunch breaks).

\*     \*     \*

The record supports the Special Master's factual findings underpinning his conclusion that Farfield recklessly disregarded whether its workers were properly classified and paid, and thus recklessly disregarded the truth or falsity of the payrolls' certifications of compliance with the Davis-Bacon Act.

---

detailed classification strictures—without contacting the signatories or the DOL—would not have been reasonable enough to preclude "deliberate ignorance" or "reckless disregard" under the FCA.

### E. The District Court Properly Shifted the Burden of Proof on Damages to Farfield.

Next, Farfield argues that the District Court improperly shifted the burden of proof on damages after Local 98 introduced "representative" evidence about the 42 employees found to have been misclassified and underpaid. Appellant's Br. 44–50. Recall that Farfield did not segregate its employees' hours spent performing groundman or laborer work from those performing lineman work. The Special Master found that substantial lineman work, such as laying conduit and pulling wire, was performed when an employee's daily time was coded to six of the 12 Farfield phase codes that Local 98 challenged. He then required Farfield to show that the 42 groundmen and laborers whose time was recorded under those six codes actually performed non-lineman work for which they were paid appropriately. After crediting Farfield's rebuttal evidence that an average of 1.5 hours of unproductive time per day was billed to these codes, and after reducing the misclassified hours accordingly, the Special Master calculated damages based on the resulting hours recorded to those codes for the 42 employees. The Special Master awarded this recovery while acknowledging that "it [wa]s possible . . . that some of the remaining time . . . was not [lineman] work." A307.

The District Court authorized this burden-shifting as an extension of the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). Under *Mt. Clemens*, an FLSA plaintiff bears the initial burden of proving that employees have "in fact performed work for which [they] were] improperly compensated" and "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687. The burden

"then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687–88. If the employer fails to do so, "the court may then award damages to the employee, even though the result be only approximate." *Id.* (citation omitted). *Mt. Clemens* also permits an award of back wages to non-testifying employees based on the representative testimony of only some employees. *See id.* at 687; *see also Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471–72 (11th Cir. 1982) ("[E]ach employee need not testify in order to make out a prima facie case of the number of hours worked as a matter of 'just and reasonable inference.'" (citing *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973)).

According to Farfield, the burden should have remained with Local 98 throughout to prove all damages with specificity. While granting that *Mt. Clemens* burden shifting is appropriate in FLSA cases, Farfield nonetheless argues that it cannot apply in this FCA case. It points out that no cases have applied *Mt. Clemens* to shift the damages burden to the defendant in an FCA case and that, unlike an FLSA case, the underpaid employees will not receive the damages award here. Farfield also challenges the "representativeness" of Local 98's evidence. Appellant's Br. 45–49. We reject both arguments.

*1.* Mt. Clemens *applies in an appropriate FCA case, like this one.* Farfield correctly notes that *Mt. Clemens* burden-shifting has not been applied in an FCA case prior to this one. But *Mt. Clemens* has been either cited approvingly or applied outright in Davis-Bacon cases. *See, e.g.*, *Janik Paving & Const., Inc. v. Brock*, 828 F.2d 84, 93 (2d Cir. 1987) (charac-

terizing *Mt. Clemens* as "the burden of proof to which the Department [of Labor] and employees [a]re generally subject in wage-standard violations"); *Pythagoras Gen. Contracting Corp. v. U.S. Dept. of Labor*, 926 F. Supp. 2d 490, 495–96, 498–99 (S.D.N.Y. 2013) (affirming DOL Administrative Review Board's invocation of *Mt. Clemens* in Davis-Bacon dispute). And a contractor's false certifications that its workers were paid at the rate legally required by the Davis-Bacon Act are fodder for an FCA claim.[31] *See, e.g.*, *U.S. ex rel. Plumbers*

---

[31] A line of cases can be read to preclude FCA claims where the falsity of the claim or statement depends on the determination of complex Davis-Bacon classification issues. *See U.S. ex rel. Windsor v. DynCorp, Inc.*, 895 F. Supp. 844, 851–53 (E.D. Va. 1995) ("[A] Davis-Bacon Act worker classification dispute, by itself, is not an FCA claim because such disputes must be resolved by the Department of Labor."). Farfield has not argued that the District Court lacked jurisdiction on this basis, and it cites *DynCorp.* only in its Reply brief to counter an unrelated point made by one of amici. *See Barna v. Bd. of Sch. Dirs.*, 877 F.3d 136, 146 (3d Cir. 2017) (noting that we will not "reach arguments raised for the first time in a reply brief or at oral argument"). Of course, the District Court *did* refer this case to the DOL for resolution of worker classification questions. It is unclear whether *DynCorp*'s rationale still applies in the wake of a referral that the agency declines. *Cf. U.S. ex rel. Wall v. Circle C Const., LLC*, 697 F.3d 345, 353–54 (6th Cir. 2012); *U.S. ex rel. Plumbers & Steamfitters Loc. Union No. 342 v. Dan Caputo Co.*, 152 F.3d 1060, 1062 (9th Cir. 1998) (per curiam). And the Supreme Court has said only that "[d]isputes over the proper classification of workers under a contract containing Davis-Bacon provision must be *referred* to the Secretary [of Labor] for determination," not that they must always

*& Steamfitters Local Union No. 38 v. C.W. Roen Const. Co.*,
183 F.3d 1088, 1091–92 (9th Cir. 1999) ("[A] false certifica-
tion that workers have been paid at the legally required wage
rate may give rise to liability under the FCA. If, as the Plumb-
ers allege, [defendant and its agents] submitted such false cer-
tifications, it may be liable under the False Claims Act." (cita-
tion omitted)).

In this FCA false-certification case, the Davis-Bacon
Act supplies the substantive law by which the falsity of Far-
field's statements is judged as well as the measure by which
employees were misclassified and underpaid. Just because the
employees themselves will not receive the underpayments
originally owed them does not mean that an employer can, by
keeping shoddy records, defeat the recovery of a person or
entity statutorily entitled to those damages.[32] Indeed, account-

be *adjudicated* by the DOL for dependent federal-question
claims to proceed. *Coutu*, 450 U.S. at 760 (emphasis added).
We are also guided by court decisions "narrowly draw[ing]"
other jurisdictional bars to judicial review of Davis-Bacon
issues. *Abhe & Svoboda*, 508 F.3d at 1058 ("shield[ing] only
the substance of wage determinations from judicial review"
(citing *Binghamton*, 347 U.S. at 177; 40 U.S.C. § 3142(b))).
So to the extent that we must independently assure the exist-
ence of subject-matter jurisdiction, we conclude that the Dis-
trict Court had jurisdiction to adjudicate the applicable worker
classifications after it referred the case to the DOL and the
DOL declined the referral.

[32] Though Farfield seeks to distinguish FLSA cases on the
grounds that the underpaid employees enjoy the recovery, it
does not challenge the District Court's conclusion that the

ability would seem at least equally important when a contractor recklessly fails to track its employees' work on a project funded by the public fisc.

While the FCA specifically places the burden of proving damages by a preponderance of the evidence on the Government or, as here, the relator, 31 U.S.C. § 3731(d), that burden is met where the Government establishes "the prima facie value" or "face amount" of the damages. *United States v. Thomas*, 709 F.2d 968, 972–73 (5th Cir. 1983). The burden then shifts to the defendant "to establish the actual value" of the damages. *Id. Mt. Clemens* enables a similar process in cases such as this one, where a relator draws prima facie evidence from the defendant's own documents to ascribe a face value to the Government's damages. Nor is the FLSA so unique as to monopolize the principles of *Mt. Clemens*; indeed, they have been applied in other contexts, including, for example, antitrust cases. *See, e.g.*, *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–266 (1946) ("[T]he wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable.").

Finally, though it argued as much to the District Court, Farfield does not sufficiently raise whether *Mt. Clemens* is inapplicable because Farfield complied with recordkeeping obligations, such as "the three-year record retention" regula-

---

measure of the Government's damages is the amount of underpaid wages. We assume without deciding that such damages were "sustain[ed]" by the Government "because of the act of [the defendant]," within the meaning of 31 U.S.C. § 3729(a).

tion under 29 C.F.R. § 5.5(a)(3)(i).[33]  A153.  We cannot say whether Farfield violated any such requirements.  Though Farfield may only have learned of a dispute about pay and hours four years after cessation of work on the Project, we do not know what records, if any, did not survive beyond the three-year period.[34]  And Farfield may have ignored its obligations by, for example, failing in the first instance to create records reflecting each worker's "correct classification." § 5.5(a)(3)(i).  In any event, the issue is unpreserved—and we doubt that the employer's actual violation of a recordkeeping regulation is the *sine qua non* of *Mt. Clemens* burden-shifting. *See, e.g.*, *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701–02 (3d Cir. 1994) (applying *Mt. Clemens* burden-shifting due to employer's *inadequate* records, with no mention of record-keeping violation).

2. *Local 98's evidence was sufficiently representative.* Farfield's challenge to the "representativeness" of Local 98's evidence also fails.  Local 98 adduced direct testimony from six workers who were classified as groundmen or laborers on the Project yet whose work was logged using the phase codes associated with lineman tasks.  Those witnesses testified about the work of 22 of the 42 affected groundmen and laborers (*i.e.*, a 52-percent sample).  Contrary to Farfield's argument, this evidence is quantitatively representative.  *See, e.g.*, *Mt. Clemens*, 328 U.S. at 680 (8 out of 300 employees testified);

---

[33] Farfield argues in its opening brief only that it saw "no need to keep records of each task that every employee performed, nor is such required."  Appellant's Br. 50.

[34] We express no view on whether Farfield violated record-keeping obligations.

*Reich v. S. New Eng. Tel. Corp.*, 121 F.3d 58, 66–68 (2d Cir. 1997) (39 of 1,500 employees representative); *Gateway Press*, 13 F.3d at 701 (testimony of 22 out of 70 employees for whom back wages were sought); *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) (5 out of 28), *cert. denied*, 488 U.S. 1040 (1989); *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 86 (10th Cir. 1983) (testimony of 12 employees sufficient for all former employees); *New Floridian Hotel*, 676 F.2d at 472 (23 testified out of 207 receiving an award).

The testimony of the six workers was also qualitatively representative. Farfield cites nothing suggesting that the frequency with which testifying workers performed lineman work under the relevant phase codes was so unique that it was unreasonable to conclude that they devoted "approximate[ly]" the same amount of time as the other affected workers to lineman work. *Mt. Clemens.* 328 U.S. at 688: *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016) ("Reasonable minds may differ as to whether the average time [] calculated is probative as to the time actually worked by each employee. Resolving that question, however, is the near-exclusive province of the [factfinder]. The District Court could have denied class certification on this ground only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing." (citation omitted)). In fact, there was evidence that "most crews were not limited in the work they performed" and that "all workers on a crew performed all of these tasks [installing conduit and pulling wire] at various times." A290–91 (Findings of Fact ¶¶ 135, 140). And to the extent that differences existed, the factfinding seems to have accounted for them.

\*     \*     \*

Shifting the burden of proof on damages to Farfield after Local 98 made out a prima facie case valuing those damages was justified here, just as it would have been in an FLSA case or a Davis-Bacon proceeding before the DOL.  And the testifying workers' incidence of lineman work under the relevant phase codes was representative of that experienced by the non-testifying affected workers.

## F.  The Award of Attorneys' Fees Was Reasonable.

Finally, we reach Farfield's challenge to the District Court's award of $1,229,927.55 in attorneys' fees to Local 98. Farfield does not claim that the District Court erred in awarding $203,226.45 in costs, nor does it assert that any of the Court's factual findings were erroneous.  The core of Farfield's argument is that Local 98's attorneys' fees incurred on the four voluntarily dismissed claims relating to other projects were not fully excluded from the lodestar, and that many of a paralegal's time entries were too vague.  Along with Farfield's other arguments, these fail as well.

Under our precedent, district courts have "substantial discretion to determine what constitutes reasonable attorneys' fees because they are better informed than an appellate court about the underlying litigation and an award of attorney fees is fact specific."  *United States ex rel. Palmer v. C&D Techs., Inc.*, 897 F.3d 128, 137 (3d Cir. 2018) (cleaned up).  So long as the District Court employed correct standards and procedures (as judged under de novo review) and made findings of fact that are not clearly erroneous, we should let its fee award stand. *See, e.g.*, *Pub. Interest Res. Grp. of N.J., Inc. v. Windall*, 51 F.3d 1179, 1184 (3d Cir. 1995).

-67-

In a 54-page memorandum opinion and order, the District Court granted in part Local 98's motion for attorneys' fees and costs. The Court made extensive findings of fact and rejected the same arguments Farfield makes here. On the point about limited success, the Court noted that Local 98's attorneys cut over 1,000 hours to account for time spent pursuing work on the four voluntarily dismissed claims. The Court then applied the test announced in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), to conclude that no further reductions were warranted because "the legal theories and claim were the same across all five projects." A19–24.[35] And the Court rejected Farfield's challenge to the paralegal's time entries.

The District Court applied the correct legal standards and procedures, and it made extensive findings of fact that are supported by the record and the posture of the litigation. We will affirm its award of attorneys' fees to Local 98.

---

[35] Farfield cursorily states that the "multiplier" of fees over and above damages shows that the fees awarded were excessive in relation to the recovery—*i.e.*, the degree of Local 98's success on its claim relating to the Project. Appellant's Br. 53. But here, there was no appreciable "multiplier": Local 98 proved up a judgment of over $1 million (70 percent of which flows to the Government), and the attorneys' fees awarded were more or less equivalent to that judgment. At all events, this recovery is substantial—if not "large" relative to the typical FCA case or the aggregate value of the Project. And "a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." *Hensley*, 461 U.S. at 440.

## VI. CONCLUSION

In the preceding pages, we resolve several issues not previously decided by our Court. Congress's 2009 amendments to 31 U.S.C. § 3729(a)(1)(B) apply retroactively to cases pending on or after June 7, 2008, no matter when the underlying conduct occurred. When deciding how to classify workers on a federally funded project, a contractor must contact either the DOL or the signatories, including the union(s), to the CBA underpinning the prevailing wage determination incorporated into the contract. A contractor's false certifications of Davis-Bacon compliance on payrolls submitted to the Government are material, absent evidence of the Government's past action relevant to associated claims or proof that the contractor's noncompliance was minor or insubstantial. And the damages burden-shifting framework applicable in FLSA and Davis-Bacon cases may apply in the appropriate FCA case. These holdings, along with the foregoing analysis, compel us to affirm the challenged orders of the District Court.